UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANGELO D. JOHNSON,

                              Plaintiff,

        v.                                        No. 17-CV-8000 (KMK)

MICHAEL A. SCHIFF, *et al.*,                      <u>OPINION & ORDER</u>

                              Defendants.

<u>Appearances</u>:

Angelo D. Johnson
Comstock, NY
*Pro Se Plaintiff*

Annemarie S. Jones, Esq.
Thomas J. Dargan, Esq.
Lewis Johs Avallone Aviles LLP
Islandia, NY
*Counsel for Supervisor Defendants*

Steven N. Schulman, Esq.
Barbara K. Hathaway, Esq.
New York State Office of the Attorney General
New York, NY
*Counsel for Defendant Loughren*

Michael Davidoff, Esq.
Drew, Davidoff & Edwards Law Offices, LLP
Monticello, NY
*Counsel for Correction Officer Defendants*

Adam L. Rodd, Esq.
Drake Loeb PLLC
New Windsor, NY
*Counsel for Medical Defendants*

David Bloom, Esq.
Edward J. Guardaro, Esq.
Kaufman Borgeest & Ryan LLP
New York, NY
*Counsel for Defendant Guinan-Clark*

KENNETH M. KARAS, United States District Judge:

Angelo D. Johnson ("Plaintiff"), currently an inmate at Great Meadow Correctional Facility, brings this pro se Action, pursuant to 42 U.S.C. § 1983, against numerous officials at Sullivan Correctional Facility ("Sullivan"), as well as New York State Commissioner of Correction Thomas J. Loughren ("Loughren") (collectively, "Defendants").[1] Plaintiff alleges that, while housed at Sullivan, Defendants provided him with inadequate medical care and

---

[1] This Action originated with multiple plaintiffs in addition to Johnson, all of whom were dismissed for failure to pay the filing fee or submit an IFP application. (*See* Order of Partial Dismissal 1 (Dkt. No. 15).) The Court also dismissed another putative plaintiff who had filed a separate Action of his own raising similar claims. (*Id.* at 2.)
The Sullivan Defendants, who are sued both in their individual and official capacities, are in four groups, organized by counsel:

(1) <u>Supervisor Defendants</u>. Sullivan Sheriff Michael A. Schiff ("Schiff"); Undersheriff Eric J. Chaboty ("Chaboty"); Administrator Harold L. Smith Jr. ("Smith"); Cpt. James E. Ginty ("Ginty"); and Lt. Christopher R. Bini ("Bini").

(2) <u>Correction Officer Defendants</u>. Correction Officer ("CO") J. Besson ("Besson"); CO Cole ("Cole"); CO Field ("Field"); CO Kleingardner ("Kleingardner"); CO D. Lekovic ("Lekovic"); CO Lewis ("Lewis"); CO S. Nash ("Nash"); CO Shaw ("Shaw"); Cpl. Calangelo ("Calangelo"); Cpl. Thomas E. Compasso ("Compasso"); Cpl. Dawson ("Dawson"); Cpl. Gabriel ("Gabriel"); Cpl. Gray ("Gray"); Cpl. Matis ("Matis"); Cpl. Whalan ("Whalan"); Cpl. Wilcox ("Wilcox"); Sgt. Harrell ("Harrell"); Sgt. Lynch ("Lynch"); Sgt. G. Minckler ("Minckler"); Sgt. Moyer ("Moyer"); Sgt. Zayas ("Zayas"); Kitchen Manager Dale Fraser ("Fraser"); and D.P.W. Joe ("Joe").

(3) <u>Medical Defendants</u>. Registered Nurse ("RN") W. Altman ("Nurse Altman"); RN Davis Crawley ("Nurse Crawley"); RN Jamie Gandulla ("Nurse Gandulla"); RN W. Moore ("Nurse Moore"); Licensed Practical Nurse ("LPN") Sauer ("Nurse Sauer"); and Dr. Good.

(4) LPN Heather Guinan-Clark ("Nurse Guinan-Clark").

unconstitutional conditions of confinement, failed to protect him from assaults by other inmates, used excessive force against him, denied him due process in connection with disciplinary hearings, and conspired and retaliated against him for filing this Action. (*See* Am. Compl. (Dkt. No. 14).) Before the Court are five Motions To Dismiss (the "Motions"). (Dkt. Nos. 156, 160, 163, 168, 173.) For the reasons that follow, the Motions are granted in part and denied in part.

## I. Background

### A. Factual Background

The following facts are taken from Plaintiff's Amended Complaint and are assumed true for purposes of resolving the instant Motions. Given the length of the Amended Complaint, which runs to 145 pages and 413 paragraphs, the Court recounts only those facts necessary for consideration of the instant Motions.

At all relevant times, Plaintiff was incarcerated at Sullivan County Jail ("Sullivan") as a pretrial detainee. (Am. Compl. ¶¶ 3, 51.) Plaintiff states that he "is a 41 year old[] black male[] who suffers from high blood pressure, seizure[s], type 1 and 2 chronic migrain[e]s, chronic sinus[] infection[s], eye defect[s], [a] prior right knee injury, [a] prior left shoulder injury, and a stomach ingestion problem." (*Id.* ¶ 254.) Plaintiff further alleges that he "has been diagnose[d] with[] depression, anxiety, post [traumatic] stress disorder, and personality disorder," and that he "had about [four] prior [suicide] attempts." (*Id.* ¶¶ 256–57.)

Upon arrival at Sullivan on December 1, 2016, Plaintiff "asserted clearly[]" to Nurse Altman and Nurse Gandulla "all health issues" and "injuries." (*Id.* ¶¶ 51–55, 255, 258.) In particular, Plaintiff disclosed an "alcohol and heroin addiction" and stated that his "withdrawal[] was starting." (*Id.* ¶ 54.) Plaintiff's "obvious" withdrawal pain grew "severe" by about December 3, 2016 — he alleges he suffered from "agonizing belly pains, migrain[e]s, cold and

hot sweats, [inability] to eat, vomiting 'continually,' . . . [and] fatigue." (*Id.* ¶¶ 55, 57.) However, Nurse Gandulla, who was in charge of Sullivan's medical department, "deni[ed] [P]laintiff adequate pain medication to detox." (*Id.* ¶¶ 56, 362.) Plaintiff's pain "confined [him] to a bed for 2 weeks." (*Id.* ¶ 58.) During that time, Plaintiff "made numerous direct complaints" about his "obvious condition," which went unanswered, to Nurse Gandulla, Nurse Altman, and Nurse Moore, as well as to Harrell, Gabriel, and Moyer, when they conducted "twice daily" rounds. (*Id.* ¶¶ 59–61.)

Further, between December 2016 and September 2017, Plaintiff complained to Dr. Good, Nurse Guinan-Clark, Nurse Sauer, Nurse Gandulla, Nurse Altman, Nurse Crawley, and Nurse Moore that his left shoulder was in "excruciating" pain. (*Id.* ¶ 311.) However, he was not provided with care "because of the County's budgetary restriction." (*Id.* ¶¶ 312, 314.) Instead, Plaintiff was given naproxen, which did not relieve the pain and which "can be serious[ly] harmful to a person['s] stomach lining [and] liver." (*Id.* ¶ 315.) On December 27, 2016, Plaintiff was seen by Nurse Guinan-Clark. (*Id.* ¶¶ 268–69.) Plaintiff stated all his medical conditions, including his left shoulder injury, and asked "why she wasn't writing down[] or recording anything [he] had told her." (*Id.*) She responded that "she [does not] have to [write] because[] she has a photographic memory." (*Id.*) She further told Plaintiff that the County could not pay for any knee or shoulder surgery and that "the best [she] can do for [him] now is replace[] [his] knee brace (foam) and give [him]" Motrin and naproxen. (*Id.* ¶ 270.) On December 31, 2016, Plaintiff saw Nurse Guinan-Clark again and requested housing with better airflow to aid his "chronic sinus[] infection." (*Id.* ¶ 271.) Plaintiff also complained that the County would not take him to see a "specialist and pay for an operation." (*Id.*) Nurse Guinan-Clark told Plaintiff that "she would speak to" Bini and "not to worry." (*Id.*) On January 3, 2017,

Plaintiff saw Nurse Guinan-Clark a third time and "qui[zz]ed" her about his medical conditions, but she "was unable to answer correctly." (*Id.* ¶¶ 273–74.) Plaintiff further told her that the pain in his "left shoulder [had] gotten worse," and stated that "there's a pinchin[g] in the nerve located in the lower neck now," (*id.* ¶ 275), but he was again told that the "County's broke" and, further, was only given Motrin, naproxen, and Tylenol, which "can have serious adverse effects" on his "stomach, [kidneys], and liver," (*id.* ¶ 276). Nurse Guinan-Clark also referred Plaintiff to a doctor. (*Id.* ¶ 277.)

On December 31, 2016, Plaintiff was moved by Cole and Lynch from his "medical" housing block, without explanation, to "modular unit M-9" — a "separate segment from the main facility of [Sullivan] — for "punitive segregation." (*Id.* at 17–18; *id.* ¶¶ 260–61.)[2] Plaintiff alleges that the two conspired to move Plaintiff "because of" his "no-nonsense spirit, mind, and energy." (*Id.* at 17–18.) Plaintiff was then given a "fabricated" misbehavior report charging him with assault of an inmate. (*Id.*) Plaintiff "immediately" filed a grievance. (*Id.* at 17.) On January 3, 2017, a hearing was held regarding Plaintiff's misbehavior report, at which Whalan served as hearing officer. (*Id.* ¶¶ 68–69.) Over Plaintiff's objections, Whalan refused Plaintiff the right to assistance, to call witnesses, and to view video footage, and further stated that Plaintiff "ha[s] no rights in [Sullivan], plus the administration says, 'No!'" (*Id.* ¶¶ 67, 69–75.) Whalan found Plaintiff guilty and sentenced him to 30 days in punitive segregation. (*Id.* ¶ 73.) Plaintiff appealed, and Bini affirmed. (*Id.* ¶¶ 76–77.)

On January 7, 2017, Plaintiff "became violently ill 30 minutes after eating the facility lunch," causing him to have severe vomiting and diarrhea. (*Id.* ¶ 282.) A non-party prison

---

[2] Where the Amended Complaint uses inconsistent paragraph numbering, the Court cites to the relevant page.

official observed Plaintiff "on the floor next to the toilet," and told him that he "alerted [the] medical department" but that the department said Plaintiff should "drop a [sick-call] slip." (*Id.* ¶¶ 283–84.) Plaintiff requested a grievance form and to see Calangelo, the unit supervisor. (*Id.* ¶¶ 284–85.) When Calangelo came, she observed Plaintiff vomiting, stated that "[no] one else is complaining about . . . food poison[ing]," and told Plaintiff that he would not be brought to the medical unit. (*Id.* ¶¶ 286–88.) However, Calangelo offered Plaintiff "some pepto" and told him to "drop a sick-call slip." (*Id.* ¶ 288.) Further, Nurse Altman, who saw Plaintiff at some point, refused to provide Plaintiff with the necessary "series of test[s]." (*Id.* ¶ 289.)

On January 18, 2017, Plaintiff was in modular unit M-9 for punitive segregation. (*Id.* ¶ 78.) Plaintiff, who was the "only black [inmate]" in the six-person unit, "was having serious racial issues" with three other inmates there. (*Id.* ¶¶ 79–80, 82.) Plaintiff had complained to Harrell and Calangelo about the inmate harassment, but they apparently did not remedy the situation. (*Id.* ¶ 81.) Plaintiff alleges that, while showering in the "locked . . . cage shower," the other inmates "thr[e]w urine" on Plaintiff and "sp[a]t[]" on him; Plaintiff "had to yell a good 20 minutes before the unit officer responded," even though the office was 10 feet away. (*Id.* ¶¶ 84–87.) By the time Calangelo responded, Plaintiff's "clothes [were] soiled with urine," which "caused [him] to be in extreme mental anguish," thus "trigger[ing] [his] high blood pressure" and migraines. (*Id.* ¶ 86.) As Calangelo removed Plaintiff, Plaintiff picked up a nearby "spray bottle of bleach" and threatened to spray the other inmates, causing Calangelo to remove the bottle and write Plaintiff up on a "fabricated" misbehavior report charging him with making threats. (*Id.* ¶¶ 88–90.) Plaintiff also was relocated to modular unit M-1. (*Id.* ¶ 90.)

On January 22, 2017, a hearing was held by Whalan regarding the Calangelo misbehavior report. (*Id.* ¶ 91.) Plaintiff alleges that, pursuant to a policy maintained by Schiff (the Sullivan

sheriff) "and [his] senior administration," he was denied his ability to prepare for the hearing. (*Id.* ¶¶ 92, 98.) Notwithstanding Plaintiff's objections that he was being prevented from having assistance, calling witnesses, and reviewing video footage, Whalan found Plaintiff guilty and sentenced him to 10 days in punitive segregation. (*Id.* ¶¶ 93–96.) Plaintiff appealed, but Bini affirmed. (*Id.* ¶¶ 97, 99.)

On February 10, 2017, while still housed in punitive segregation, Plaintiff was let out for lunch when there was a physical altercation between Plaintiff and another inmate, who was the aggressor. (*Id.* ¶¶ 100–05.) Nash "was just standing" nearby "enjoying the spectacle" and failed to intervene. (*Id.* ¶ 104.) Nash allegedly acted pursuant to a policy maintained by "Schiff and his administration" of "promoting and orchestrating fights amongst prisoners." (*Id.* ¶¶ 10, 106.) Only after 10 minutes did Nash "call[] for a code 7" alarm. (*Id.* ¶¶ 106–07.) Nash then "fabricated a misbehavior report" charging Plaintiff with being the aggressor in the fight. (*Id.* ¶ 113.)

On February 20, 2017, Whalan held a hearing regarding the Nash misbehavior report. (*Id.* ¶¶ 115–16.) Plaintiff alleges that he was again denied "his right to assistance to prepare for his defense." (*Id.* ¶ 117.) Notwithstanding Plaintiff's objections and unsuccessful requests to call and cross-examine witnesses, he was found guilty. (*Id.* ¶¶ 118–23.) Plaintiff received 30 days of punitive segregation and 30 days of lost privileges. (*Id.* ¶ 124.) Plaintiff appealed, and Bini affirmed. (*Id.* ¶ 125.)

In early July 2017, Plaintiff and another inmate got in an argument. (*Id.* ¶¶ 130–32.) Compasso came, but did nothing except "stare[] . . . for a couple seconds" and then leave. (*Id.* ¶ 133.) Plaintiff alleges that Compasso "failed to remove[] a . . . potential fight risk." (*Id.* ¶ 134.) Some days later, Plaintiff and the inmate again began arguing, which turned into a

physical altercation. (*Id.* ¶¶ 135–39.) The fight was broken up by Cole, after which Plaintiff was taken to the medical unit, where Nurse Altman asked if Plaintiff had suffered any "new" injuries separate from his existing shoulder and other conditions. (*Id.* ¶¶ 140–45.) Plaintiff thus received "no medical treatment [for] his severe pain in his left shoulder." (*Id.* ¶¶ 146–47.)

On July 12, 2017, Plaintiff was transferred to a new housing unit on "c-block" and placed "into a[n] unsanitary cell with a dysfunctional toilet." (*Id.* ¶¶ 149–50.) On July 13, 2017, Plaintiff complained to Field, Krentz, and Besson, but they failed to remedy the problem. (*Id.* ¶¶ 151–59.) Eventually, Gray and Minckler came to investigate, but their questions focused on Plaintiff's "previous fight" with another inmate and, further, they used racial slurs against Plaintiff. (*Id.* ¶¶ 160–63.) They then demanded Plaintiff "put [his] black fucking hands [through] the bars," and, when Plaintiff "approach[ed] the front of his cell to comply," Minckler "spray[ed]" the "fully cooperative" Plaintiff with "O.C. spray" into his face and eyes and on to his dreadlocks. (*Id.* ¶ 165.) Plaintiff, who "was barely able to breathe" and whose eyes were "burning" and in "excruciating pain," was "roughly handcuffed and brought to the medical station," all while Minckler and Gray joked that Plaintiff is "not so tough now." (*Id.* ¶¶ 166–67.) At the medical station, Nurse Altman gave Plaintiff oxygen, but "failed to adequately decontaminate [him], only rinsing the face area and eyes, . . . failing to adequately decontaminate [P]laintiff's dreadlocks." (*Id.* ¶ 168.) Plaintiff was then taken to punitive segregation in modular unit M-9 and only permitted to take hot showers, which "reactivate[d]" the "oil base" in the O.C. spray and caused him "unnecessary excruciating pain." (*Id.* ¶¶ 169–71.) Plaintiff complained to Nurse Altman, Gray, Minckler, Calangelo, Harrell, Gabriel, Zayas, and Joe about the heat of the showers over the next two weeks, but they did not permit him to take cold showers or otherwise remedy the situation. (*Id.* ¶¶ 171–75.)

On July 13, 2017, Plaintiff received two misbehavior reports, filed by Minckler and Besson, relating to the O.C. spray incident, which charged him with various offenses relating to refusal to obey orders. (*Id.* ¶¶ 176, 178.) On July 17, 2017, Whalan held a disciplinary hearing on the reports. (*Id.* ¶ 178.) Plaintiff again objected unsuccessfully that he was denied a meaningful opportunity to prepare for the disciplinary hearing. (*Id.* ¶¶ 176–84.) Whalen "dismissed" the misbehavior report filed by Besson, but found Plaintiff guilty of the report filed by Minckler and sentenced him to 90 days in punitive segregation. (*Id.* ¶¶ 185–87.) Plaintiff appealed, but Bini affirmed. (*Id.* ¶¶ 188–89.)

On August 7, 2017, while housed in modular unit M-8, Plaintiff was "feeling very dizzy" and had "a very hard time catching [his] breath," and called for help. (*Id.* ¶ 291.) Shaw responded, and Plaintiff "told him that he felt a seizure coming on" and to "call medical." (*Id.*) However, Shaw told him that it was "almost time for [him] to leave, and there's no medical here pas[t] 11:00pm," and as such Plaintiff would "have to put in a sick call slip for tomorrow." (*Id.* ¶ 292.) Plaintiff again told Shaw to call "emergency medical," but Shaw refused and left. (*Id.* ¶¶ 293–94.) Cole later made his rounds, and Plaintiff asked him to "alert emergency medical[] due to a pending seizure attack." (*Id.* ¶ 296.) Cole refused and told him to fill out a sick call slip. (*Id.* ¶ 297.) By this point Plaintiff "had urinated on himself," had "blood in [his] mouth," had "a throbbing migrain[e]," and had his "sheets [in] disarray," a "clear indication that [he] had a seizure." (*Id.* ¶ 298.)

In September 2017, Plaintiff was "finally sent out" to an outside medical provider "for treatment" for his left shoulder and right knee. (*Id.* ¶ 308.) There, he received an x-ray for his knee, and was informed that he had "severe arthritis couple[d] with [a] tear" in his shoulder and should undergo "reconstructive surgery." (*Id.* ¶¶ 309–10, 313.)

On September 14, 2017, while in modular unit M-5, Plaintiff awoke with "severe stomach pains" and "diarrhea" due to food poisoning. (*Id.* ¶ 301.) Plaintiff called for help, and Field responded, but then left without contacting the medical unit. (*Id.* ¶¶ 302–05.) Instead, Field served Plaintiff with a "false misbehavior report" charging him with yelling. (*Id.* ¶ 306.)

In October 2017, Lewis turned up the heat in modular unit M-5 very high, causing Plaintiff to suffer migraines and severe pain and, further, causing mold. (*Id.* ¶¶ 204–06.) When Plaintiff complained, Lewis wrote up a fabricated and retaliatory misbehavior report. (*Id.* ¶¶ 203, 208–09.) On October 24, 2017, Wilcox held a disciplinary hearing regarding the Field misbehavior report. (*Id.* ¶ 195.) Plaintiff objected on grounds that Wilcox could not be impartial because Plaintiff had recently filed this Action (on October 16, 2017) against Sullivan prison officials by "hand[ing] over to [Sullivan] authorities" the relevant paperwork. (*Id.* ¶ 196.) Wilcox rejected the objection and verbally belittled Plaintiff. (*Id.* ¶ 197.) Plaintiff further objected, unsuccessfully, that he was denied the ability to call witnesses and to be heard. (*Id.* ¶¶ 199–200.) Wilcox found Plaintiff guilty and sentenced him to 30 days in punitive segregation. (*Id.* ¶ 198.) Plaintiff appealed, and Bini affirmed. (*Id.* ¶ 210.)

On October 30, 2017, while in punitive segregation, Plaintiff was let out of his cell to get lunch, when Kleingardner "'smash[ed]' all the contents [of the food] . . . together[] and then wedged it [through] the bars" in order to "belittle" Plaintiff. (*Id.* ¶¶ 212–15.) Plaintiff protested, causing Kleingardner to yell at him; the two thereafter got in a screaming match. (*Id.* ¶¶ 216–19.) After the argument, Plaintiff requested a grievance form, and Kleingardner denied him one. (*Id.* ¶¶ 220–21.) Kleingardner then served Plaintiff with a "false" and "retaliat[ory]" misbehavior report charging Plaintiff with making threats. (*Id.* ¶¶ 222–24, 227.) On October 31, 2017, Plaintiff filed a grievance against Kleingardner. (*Id.* ¶ 224.)

On November 4, 2017, Wilcox held a disciplinary hearing on the Kleingardner misbehavior report. (*Id.* ¶ 227.) Plaintiff unsuccessfully "objected to not being provided with a 24 hour notice of [the] misbehavior report" and to being denied the ability to have assistance, gather evidence, and otherwise defend his case. (*Id.* ¶¶ 228–34.) Plaintiff objected that Wilcox was "retaliating against [him]" because he had filed the instant Action. (*Id.* ¶ 231.) Wilcox found Plaintiff guilty, Plaintiff appealed, and Bini affirmed. (*Id.* ¶ 236.)

On November 6, 2017, Plaintiff remembers returning to consciousness from a seizure and seeing Harrell and Nurse Sauer "debate over the cheapest way to transport [him] to the hospital." (*Id.* ¶¶ 320–21, 330.) Plaintiff was ultimately taken to the hospital "in the back of a damn patrol car." (*Id.* ¶¶ 322–23.) While being carried to the patrol car, Plaintiff "bang[ed] [his] head twice" and was thrown on the car's "dirty, wet floor." (*Id.* ¶ 324.) When Plaintiff returned from the hospital, Lisa Sauer "recklessly failed to take and check" Plaintiff's vitals. (*Id.* ¶¶ 326, 331, 363.)

On November 12, 2017, while in the M-1 modular unit, Plaintiff told Nash that his head was in pain and that he "need[ed] more air to breath[e]," after which he had a seizure. (*Id.* ¶¶ 332–33.) When Plaintiff regained consciousness, he was told that "the nurse will be right back after . . . medication rounds." (*Id.* ¶ 334.) Plaintiff complained, stating that he "could have choked or suffocated to death" while "the nurse [was] on medication rounds." (*Id.* ¶ 335.) When Nurse Sauer arrived, she told Plaintiff that Nurse Crawley did not properly call her. (*Id.*) Further, when Plaintiff did receive some medical attention, it was not adequate as "no vitals of any sort [were] performed." (*Id.*) Later, Compasso arrived with Nurse Moore, who "place[d] a devi[c]e upon [P]laintiff's finger." (*Id.* ¶ 341.) However, Nurse moor did not "finish the finger vital." (*Id.* ¶ 343.)

On December 9, 2017, Plaintiff received "paper documents in between the cell bars," which he recognized as "copies of disciplinary hearings []which were unlawfully conducted without [P]laintiff['s] knowledge and . . . consent." (*Id.* ¶¶ 238–39.) In particular, Plaintiff alleges that Wilcox had held hearings without Plaintiff present that (1) found Plaintiff guilty of unspecified charges contained in misbehavior reports filed by Field, and imposed a punishment of 180 days in punitive segregation and (2) found Plaintiff guilty of unspecified charges contained in misbehavior reports filed by Crawley, Rodriguez, Gorr, and Olsen, and imposed a punishment of 150 days in punitive segregation. (*Id.* ¶¶ 240–42.) When Plaintiff learned of the hearings, he appealed, but Bini did not respond. (*Id.* ¶¶ 244–45.) Plaintiff alleges that the charges in these misbehavior reports were fabrications. (*Id.* ¶¶ 247–53.)

On January 5, 2018, while Plaintiff was in the M-1 modular unit, Gabriel, Lekovic, and Kleingardner came to Plaintiff's cell while his cellmate was out on recreation. (*Id.* ¶ 338.) Gabriel, Lekovic, and Kleingardner used racist and harassing language to him. (*Id.* ¶ 339–40, 343, 348.) When Plaintiff asked Gabriel "why [he was] by [Plaintiff's] cell" given that Plaintiff had "open complaints against [him]," the officers pulled out their handcuffs and yelled at Plaintiff to place his hands through the cell door chute, a "prohibited" procedure. (*Id.* ¶¶ 340–42.) Plaintiff did so, and Gabriel placed handcuffs on Plaintiff, thus "cutting off the circulation," and "yank[ed]" Plaintiff out of his cell "without standard video recording safety measure procedures." (*Id.* ¶¶ 344–45.) Gabriel, Lekovic, and Kleingardner took Plaintiff "to the other end of the tier" and then searched Plaintiff's cell "without any security camera." (*Id.* ¶ 346.) Plaintiff complained that this was a violation, but Gabriel yelled back, using racist language. (*Id.* ¶¶ 347–48.) Gabriel, Lekovic, and Kleingardner then "used brutal force" on Plaintiff, who was "fully cooperative," by repeatedly "punching and kicking [him] upon the head, chest, arms,

legs[,] and back," after which they dragged him back into the cell.  (*Id.* ¶¶ 349–50.)  After the assault, Plaintiff yelled for help and stated that he needed medical; however, when Zayas, Nurse Gandulla, Nurse Moore, Chaboty, Matis, Moyer, Lynch, and Harrell variously came around, they refused to provide him with any help.  (*Id.* ¶¶ 351–60.)

Finally, Plaintiff alleges more generally that the modular housing units, overseen by Schiff and Joe, provide inadequate living conditions, including inadequate ventilation, bright lighting, drastic heat changes, mold, bad smell, and "brown" water that is "foul tasting," "burning when dr[u]nk," "upset[ing] [to the] stomach," causes "skin rashes," and sometimes undrinkable.  (*Id.* ¶¶ 261–62, 366, 368–73.)  Whenever Plaintiff was placed in the M-1 unit, which provides a "constant watch" over inmates dealing with mental health problems, Plaintiff was housed next to "seriously mentally ill prisoners" and was thus "expose[d] to screaming and feces-smearing" and "constant, loud banging," thus causing "great psychological agony."  (*Id.* ¶¶ 265, 267, 366–67.)  Plaintiff also alleges that the food generally provided at Sullivan — the preparation of which overseen by Fraser — is "spoiled, raw, cold, [and] tampered with," thus causing severe pain and sickness, (*id.* ¶¶ 370–71); that there were "drain flies" and "other vermin" in the showers, notwithstanding Sullivan's attempts at "spraying" them, (*id.* ¶ 374); that he was deprived of newspapers, law books, self-help books, and other reading material, (*id.* ¶ 375); and that the grievance program at Sullivan is inadequate, (*id.* ¶¶ 376–400).  Plaintiff also alleges that the Sullivan law library is inadequate, (*id.* ¶¶ 402–09), causing him to be "unable to file" a complaint in this Action, (*id.* ¶ 46), and further causing the Chief Judge McMahon to deny the application for a temporary restraining order that Plaintiff did file, (*id.* ¶ 48).

Plaintiff initiated this Action on October 16, 2017 by filing an "Order to Show Cause for Preliminary Injunction and Temporary Restraining Order" and accompanying documents, along with an application to proceed in forma pauperis ("IFP").  (Dkt. Nos. 1–9.)  On October 24, 2017, Judge McMahon issued an Order that, as relevant here, denied the application for a TRO and preliminary injunction without prejudice and construed the "Affidavit for TRO" filed at Dkt. No. 5 as the initial Complaint.  (*See* Order (Dkt. No. 10).)

On January 26, 2018, Plaintiff filed the instant Amended Complaint.  (Am. Compl. (Dkt. No. 14).)  On April 11, 2018, Judge McMahon dismissed from this Action other inmates who had signed the Amended Complaint but who had not paid the filing fee or submitted an IFP application.  (Order of Partial Dismissal (Dkt. No. 15).)  On April 12, 2018, Judge McMahon granted Plaintiff's IFP application.  (Dkt. No. 17.)

On October 11, 2018, Correction Officer Defendants filed their Motion To Dismiss and accompanying papers.  (Not. of Mot. (Dkt. No. 156); Decl. of Michael Davidoff, Esq. in Supp. of Mot. (Dkt. No. 157); Mem. of Law in Supp. of Mot. ("CO Defs.' Mem.") (Dkt. No. 158).)  On October 12, 2018, Supervisor Defendants filed their Motion To Dismiss and accompanying papers.  (Not. of Mot. (Dkt. No. 160); Decl. of Annemarie S. Jones, Esq. in Supp. of Mot. (Dkt. No. 161); Mem. of Law in Supp. of Mot. ("Sup. Defs.' Mem.") (Dkt. No. 162).)  On the same date, Nurse Guinan-Clark filed her Motion To Dismiss and accompanying papers.  (Not. of Mot. (Dkt. No. 163); Decl. of David Bloom, Esq. in Supp. of Mot. (Dkt. No. 164); Mem. of Law in Supp. of Mot. ("Guinan-Clark Mem.") (Dkt. No. 165).)  On the same date, Medical Defendants filed their Motion To Dismiss and accompanying papers.  (Not. of Mot. (Dkt. No. 168); Decl. of Adam L. Rodd, Esq. in Supp. of Mot. (Dkt. No. 169); Mem. of Law in Supp. of Mot. ("Med.

Defs.' Mem.") (Dkt. No. 171).)  On the same date, Loughren filed his Motion To Dismiss and accompanying papers.  (Not. of Mot. (Dkt. No. 173); Mem. of Law in Supp. of Mot. ("Loughren Mem.") (Dkt. No. 174).)

On November 27, 2018, Plaintiff filed a response in opposition to Loughren.  (Decl. of Angelo Johnson & Mem. of Law in Opp'n to Mot. ("Pl.'s Loughren Mem.") (Dkt. No. 182).)  On December 18, 2018, Plaintiff filed a response in opposition to Medical Defendants and Nurse Guinan-Clark.  (Decl. of Angelo Johnson & Mem. of Law in Opp'n to Mots. ("Pl.'s Med. Mem.") (Dkt. No. 193).)  On December 21, 2018, Plaintiff filed a response to Correction Officer Defendants.  (Letter from Angelo Johnson to Court ("Pl.'s CO Mem.") (Dkt. No. 194).)  On January 8, 2018, Plaintiff filed a response in opposition to Supervisor Defendants.  (Decl. of Angelo Johnson & Mem. of Law in Opp'n to Mot. ("Pl.'s Sup. Defs.' Mem.") (Dkt. No. 198).)

On January 22, 2019, Correction Officer Defendants filed a reply.  (Reply Mem. of Law in Supp. of Mot. ("CO Defs.' Reply") (Dkt. No. 203).)  On January 23, 2019, Nurse Guinan-Clark filed a reply.  (Reply Mem. of Law in Supp. of Mot. ("Guinan-Clark Reply") (Dkt. No. 207).)  On the same date, Medical Defendants filed a reply.  (Reply Mem. of Law in Supp. of Mot. ("Med. Defs.' Reply") (Dkt. No. 210).)  On the same date, Loughren filed a reply.  (Reply Mem. of Law in Supp. of Mot. ("Loughren Reply") (Dkt. No. 212).)  On January 30, 2019, Supervisor Defendants filed a reply.  (Reply Mem. of Law in Supp. of Mot. ("Sup. Defs.' Reply") (Dkt. No. 214).)

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his

entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations, quotation marks, and alterations omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (quotation marks and alteration omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff need allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering a motion to dismiss, the Court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (same). Further, "[f]or the

purpose of resolving [a] motion to dismiss, the Court . . . draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Where, as here, a plaintiff proceeds pro se, the "complaint[] must be construed liberally and interpreted to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (quotation marks omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and quotation marks omitted)).

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks and citation omitted). When a plaintiff proceeds pro se, however, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint." *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks omitted).

B. Analysis

Supervisor Defendants and Correction Officer Defendants principally argue that: (1) failure to provide an adequate grievance procedure is not a cognizable claim; (2) Plaintiff fails to state a procedural due process claim; (3) Plaintiff fails to state a conditions-of-

confinement claim; (4) Plaintiff fails to state an access-to-courts claim; (5) Plaintiff fails to state

a retaliation claim; (6) Plaintiff fails to state a conspiracy claim; (7) Plaintiff fails to allege the

personal involvement of certain individuals in any constitutional violation; (8) Plaintiff fails to

state a *Monell* claim; and (9) Plaintiff's request for injunctive relief is moot. (*See* Sup. Defs.'

Mem. 9 *et seq.*; CO Defs.' Mem. 17 *et seq.*) Medical Defendants and Nurse Guinan-Clark argue

that Plaintiff fails to state a claim of deliberate indifference to his medical needs. (*See* Med.

Defs.' Mem. 9 *et seq.*; Guinan-Clark Mem. 10 *et seq.*) Loughren argues that Plaintiff fails to

allege his personal involvement in any constitutional violation. (*See* Loughren Mem. 9 *et seq.*)

The Court addresses each argument separately to the extent necessary.

### 1. Injunctive Relief

Plaintiff seeks prospective injunctive relief. (*See* Am. Compl. 138–39.) This request is

moot. "[A]n inmate's transfer from a prison facility generally moots claims for declaratory and

injunctive relief against officials of that facility." *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d

Cir. 2006) (citations omitted). Plaintiff has been transferred from Sullivan, a county-level

facility — and the facility at which the alleged constitutional violations occurred — to Great

Meadow, a state-level facility managed by DOCCS. All Defendants are Sullivan officials or

state officials. The Amended Complaint does not allege, and Plaintiff does not argue, that any

Defendant has a connection with Great Meadow. Accordingly, the Court "hold[s] moot all

injunctive and declaratory claims." *Id.*

### 2. Personal Involvement

#### a. Applicable Law

"It is well settled that, in order to establish a defendant's individual liability in a suit

brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the

alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir.

2013). To establish personal involvement, a plaintiff must show that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 139 (citation, italics, and quotation marks omitted). In other words, "[b]ecause vicarious

liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official

defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*,

556 U.S. at 676. Therefore, Plaintiff must plausibly allege that Defendants' actions fall into one

of the five categories identified above. *See Lebron v. Mrzyglod*, No. 14-CV-10290, 2017 WL

365493, at *4 (S.D.N.Y. Jan. 24, 2017) (holding that the five categories "still control[] with

respect to claims that do not require a showing of discriminatory intent" post-*Iqbal*).

### b. Loughren

Plaintiff does not plausibly allege the personal involvement of Loughren, the

Commissioner of the New York State Commission of Correction, in any alleged constitutional

violation. There is no suggestion that Loughren directly participated in the events alleged in the

Amended Complaint. Nor, as Loughren argues (*see* Loughren Mem. 17), is it plausibly alleged

that Loughren, as the head of a state-level agency, has any meaningful control of or supervision

over Sullivan, a county-level facility, such that it might be said Loughren created or maintained

an unconstitutional policy or custom (relating, for example, to inmate medical care or

disciplinary hearings), was grossly negligent with regard to training or supervision, or acted with

deliberate indifference to inmates' rights. Even assuming Loughren has some supervisory

authority over Sullivan, "[a] supervisory official cannot be held liable in a § 1983 action based on [the doctrine of] respondeat superior." *Thurmond v. Thomas-Walsh*, No. 18-CV-409, 2019 WL 1429559, at *12 (S.D.N.Y. Mar. 29, 2019) (collecting cases). To the extent Plaintiff alleges that he sent complaints and grievances to Loughren in 2017, while at Sullivan, and failed to receive a response, (Am. Compl. ¶¶ 392–93), "it is well-established that an allegation that" a supervisory official "ignored a prisoner's letter of protest . . . is insufficient to hold that officer liable for the alleged violations." *Ward v. Capra*, No. 16-CV-6533, 2019 WL 1922290, at *3 (S.D.N.Y. Apr. 30, 2019) (quotation marks omitted) (collecting cases); *see also Martinez v. Loughren*, No. 13-CV-1319, 2018 WL 1532435, at *2–4 (E.D.N.Y. Mar. 29, 2018) (holding that the plaintiff failed to allege the personal involvement of Loughren because he "was not a supervisory official" at the facilities in which the plaintiff was held, and "had no direct power to control or direct the customs and policies of the facilities" (quotation marks omitted)), *appeal dismissed* (Jan. 18, 2019). Therefore, the Court concludes that Plaintiff fails to establish Loughren's personal involvement.[3]

### c. Correction Officer Defendants

Correction Officer Defendants argue that, "[i]n regard to many of the [Correction Officer Defendants], Plaintiff either fails to allege a constitutional deprivation or fails to allege personal involvement in such a constitutional deprivation by such Defendant." (CO Defs.' Mem. 20.) This conclusory "argument" — which runs to a single sentence without citation — entirely fails to specify which individuals were allegedly not personally involved. (*See id.*) The Court therefore declines at this stage to dismiss any Correction Officer Defendant on personal

---

[3] Accordingly, the Court need not reach Loughren's argument that he is entitled to qualified immunity. (*See* Loughren Mem. 19.)

involvement grounds. *See Grant v. City of Syracuse*, No. 15-CV-445, 2017 WL 5564605, at *12 n.12 (N.D.N.Y. Nov. 17, 2017) ("Courts need not consider cursory arguments of this kind, and the Court declines to do so here." (citation and quotation marks omitted)).

### d. Supervisor Defendants

Supervisor Defendants argue that Plaintiff fails to allege their personal involvement in any alleged constitutional violation. (Sup. Defs.' Mem. 21–26.)

As to Schiff, Plaintiff alleges that, as the Sullivan sheriff and "decisionmaker of policies," (Am. Compl. ¶ 10), he "and his senior administration" maintained formal or informal policies relating to the inmate grievance procedure, depriving inmates of due process in disciplinary hearings, depriving inmates of adequate medical care, orchestrating fights between inmates, and maintaining unhygienic and inadequate conditions of confinement, (*see id.* ¶¶ 92, 98, 106, 114, 117, 122, 124–25, 177, 179, 186, 189, 194, 202, 205, 208, 211, 225–26, 237, 245–50, 264–65, 280–81, 300, 329, 334, 360, 365, 388, 394–95, 402). Yet, as noted, "[a] supervisory official cannot be held liable in a § 1983 action based on [the doctrine of] respondeat superior." *Thurmond*, 2019 WL 1429559, at *12 (collecting cases); *see also Banks v. Annucci*, 48 F. Supp. 3d 394, 416 (N.D.N.Y. 2014) ("Where a defendant is a supervisory official, a mere 'linkage' to the unlawful conduct through the 'chain of command' (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct." (citations omitted)). Here, Plaintiff does not allege that Schiff had any direct involvement in any of the alleged misconduct in the Amended Complaint. Nor does Plaintiff allege any non-conclusory facts suggesting that Schiff maintained an unconstitutional policy or custom, was grossly negligent in supervising subordinates, or exhibited deliberate indifference to Plaintiff's rights. *See Webster v. Fischer*, 694 F. Supp. 2d 163, 179 (N.D.N.Y. 2010) ("Vague and

conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability." (citation omitted)).

As to Smith, the Sullivan "jail administrator," (Am. Compl. ¶ 12), Plaintiff makes no substantive allegations, and, accordingly, necessarily fails to state his personal involvement. *See Clay v. Lee*, No. 13-CV-7662, 2019 WL 1284290, at *4 (S.D.N.Y. Mar. 20, 2019) (collecting cases for the proposition that personal involvement is not established where the defendant's name appears only in the caption of the complaint and no substantive allegations are made against the defendant). To the extent Plaintiff alleges that Smith forms part of Schiff's "senior administration," Plaintiff fails to state his personal involvement for the reasons above.

As to Ginty, Plaintiff alleges that he received Plaintiff's grievances and ignored them. (Am. Compl. ¶ 281.) However, as noted, "an allegation that a supervisory official allegedly ignored a prisoner's letter of protest is insufficient to hold that officer liable for the alleged violations." *Ward*, 2019 WL 1922290, at *3 (quotation marks and alteration omitted) (collecting cases). To the extent Plaintiff alleges that Ginty, as a Sullivan captain, (Am. Compl. ¶ 13), forms part of Schiff's "senior administration," Plaintiff fails to state his personal involvement for the reasons above.

As to Chaboty, Plaintiff alleges that, on January 5, 2018, following the alleged assault by Gabriel, Lekovic, and Kleingardner, Chaboty — the Sullivan undersheriff — passed by Plaintiff's cell. (Am. Compl. ¶¶ 44, 356.) Plaintiff called out to Chaboty saying, "[S]ome of your staff just assaulted me early on!," but Chaboty answered him by saying, "I'm busy . . . can't stop, I'm touring!" (*Id.*) As noted, an allegation that a supervisory official ignored a prisoner's letter of protest does not establish that officer's personal involvement; by the same logic, an

allegation that a supervisory official ignored an oral complaint is insufficient to hold that officer liable for the alleged violations. *See Perkins v. Napoli*, No. 09-CV-6302, 2011 WL 6148988, at *7 (W.D.N.Y. Dec. 12, 2011) ("[The plaintiff's] alleged oral complaint to [the supervisor defendant] . . . , in which [he] purportedly complained that he had been assaulted by staff two days earlier, is also insufficient to establish [the supervisor defendant's] personal involvement in the [assault] incident."). Further, to the extent Plaintiff alleges that Chaboty is part of Schiff's "senior administration," Plaintiff fails to state his personal involvement for the reasons above.

As to Bini, Plaintiff principally alleges that he repeatedly affirmed Whalan and Wilcox's allegedly unconstitutional disciplinary hearings. (Am. Compl. ¶¶ 77, 99, 125, 189, 210, 236, 245.) Yet, as discussed at length in *Colon v. Annucci*, 344 F. Supp. 3d 612 (S.D.N.Y. 2018), "[i]t is an open question in the Second Circuit whether an appeal officer may be held liable for failing to reverse the outcome of an allegedly unconstitutional disciplinary hearing." *Id.* at 630 (citation and quotation marks omitted). Consistent with *Colon*, the Court concludes that Bini is entitled to qualified immunity as to this allegation because this area of law is "unsettled," and it is not clear that "every reasonable official" would have known that affirming the findings of allegedly unlawful disciplinary hearings violates an inmate's constitutional rights. *Id.* at 631–32 (citation omitted). In addition, Plaintiff alleges that Bini, like Ginty, received Plaintiff's grievances and ignored them. (Am. Compl. ¶ 337.) This allegation fails to state Bini's personal involvement for the same reasons. Finally, to the extent Plaintiff alleges that Bini is part of Schiff's "senior administration," Plaintiff fails to state his personal involvement for the reasons above.

In sum, the Court concludes that Plaintiff fails to establish the personal involvement of Schiff, Smith, Ginty, Chaboty, and Bini in any constitutional violation.

### 3. *Monell* Liability

"Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (holding that a municipality may not be liable under § 1983 "by application of the doctrine of respondeat superior" (citation and italics omitted)). That is, "municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right." *Newton v. City of New York*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008). Therefore, "to prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (citing *Monell*, 436 U.S. at 690–691). The fifth element reflects the notion that a *Monell* defendant "may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 403 (1997) (citation omitted). A plaintiff may satisfy the fifth element by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted).

Here, as noted *supra* Section II.B.2.d, Plaintiff repeatedly alleges throughout the Amended Complaint that "Schiff and his senior administration" maintain formal or informal

policies relating to the inmate grievance procedure, depriving inmates of due process in disciplinary hearings, depriving inmates of adequate medical care, orchestrating fights between inmates, and maintaining unhygienic and inadequate conditions of confinement. Yet, Plaintiff fails to allege facts beyond those of this case, which leaves Plaintiff short of the threshold. *See Gordon v. City of New York*, No. 10-CV-5148, 2012 WL 1068023, at *4 (E.D.N.Y. Mar. 29, 2012) (dismissing *Monell* claim where the plaintiff's "allegation [was] unsupported by anything other than the facts of what occurred in his particular case" (citation omitted)); *see also Cox v. City of New Rochelle*, No. 17-CV-8193, 2019 WL 3778735, at *8 (S.D.N.Y. Aug. 12, 2019) (dismissing *Monell* claim where, "apart from the incident giving rise to this case . . . [the] [p]laintiff fail[ed] to allege facts plausibly suggesting any other similar example of [the municipality's] failure to supervise or train officers"). Accordingly, the Court dismisses all claims against Defendants in their official capacities.

### 4. Deliberate Indifference Claims

"There are three basic theories pursuant to which inmates customarily bring Eighth Amendment claims: (1) denial of adequate medical care; (2) unconstitutional conditions of confinement unrelated to medical care; and (3) failure to protect." *Pugh v. Orange County Corr. Facility*, No. 14-CV-4854, 2016 WL 831968, at *5 (S.D.N.Y. Feb. 29, 2016) (citation and quotation marks omitted). Plaintiff invokes all three here. The Court addresses each in turn.

### a. Applicable Law

"A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight[h] Amendment." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). To state a conditions of confinement claim, an inmate must plausibly allege (1) "that he

suffered a sufficiently serious constitutional deprivation," and (2) that the defendant "acted with deliberate indifference." *Feliciano v. Anderson*, No. 15-CV-4106, 2017 WL 1189747, at *8 (S.D.N.Y. Mar. 30, 2017) (citation omitted).

Under the first "objective" element, the inmate must show that the "the alleged deprivation" is "sufficiently serious," *Spavone*, 719 F.3d at 138 (citation and quotation marks omitted), that is, that "the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health," *Walker*, 717 F.3d at 125 (citation omitted). In the medical care context, analyzing this objective requirement involves two inquiries: "whether the prisoner was actually deprived of adequate medical care," and "whether the inadequacy in medical care is sufficiently serious," which in turn "requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin*, 467 F.3d at 279–80 (citations omitted). "There is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition." *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003). Nevertheless, the Second Circuit has offered the following non-exhaustive list of factors to consider when evaluating an inmate's medical condition: "(1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment, (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Id.* (citation and quotation marks omitted).

Under the second element, which goes to mental state, the inmate must show that the prison official "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35. An

official's awareness of the risk of serious harm can be established through "inference from circumstantial evidence," including "from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).  However, "mere negligence" is insufficient to state a claim for deliberate indifference.  *Walker*, 717 F.3d at 125 (quoting *Farmer*, 511 U.S. at 835).  Neither does "mere disagreement over the proper treatment . . . create a constitutional claim"; "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to a[] [deliberate indifference] violation." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998).

"The two-pronged framework for claims of deliberate indifference set forth in *Darnell* "applies with equal measure to failure to protect claims." *Luckey v. Jonas*, No. 18-CV-8103, 2019 WL 4194297, at *3 (S.D.N.Y. Sept. 4, 2019) (citation and quotation marks omitted).

### b.  Medical Deliberate Indifference Claims

Medical Defendants and Nurse Guinan-Clark argue that Plaintiff fails to state a claim of deliberate indifference to his medical needs.  (Med. Defs. Mem. 9 *et seq.*; Guinan-Clark Mem. 10 *et seq.*)

### i.  Medical Conditions Upon Admission to Sullivan

Plaintiff alleges that, upon his admission to Sullivan in December 2016, he suffered from drug and alcohol withdrawal symptoms, high blood pressure, seizures, migraines, sinus infections, eye problems, stomach problems, knee and shoulder injuries, as well as multiple mental health conditions; that he advised Nurses Altman, Gandulla, and Moore (as well as correction officers Harrell, Gabriel, and Moyer) of these conditions; and that he did not receive adequate medical treatment.  (Am. Compl. ¶¶ 51–61, 254–58, 362.)  Plaintiff also alleges that he saw Nurse Guinan-Clark three times between December 2016 and January 2017; that he

described to her his medical conditions, and in particular described his left shoulder pain and a pinched nerve; that she failed to properly document his medical history; that she replaced his foam knee brace and provided Plaintiff with Motrin and naproxen for pain and swelling relief on December 27, 2016; that she told Plaintiff she would speak with Bini about moving Plaintiff to a different housing unit with better ventilation; and that she referred Plaintiff to a doctor. (*Id.* ¶¶ 268–78.)[4]

As to the alleged drug and alcohol withdrawal symptoms, Medical Defendants argue that withdrawal symptoms of "relatively short duration" are insufficient to satisfy the objective element. (Med. Defs.' Mem. 9.) The Court disagrees. "Courts have held that drug or alcohol withdrawal alone constitutes a serious medical condition." *Lara-Grimaldi v. County of Putnam*, No. 17-CV-622, 2018 WL 1626348, at *13 (S.D.N.Y. Mar. 29, 2018) (collecting cases); *see also Ryan v. County of Nassau*, No. 12-CV-5343, 2018 WL 354684, at *5 (E.D.N.Y. Jan. 10, 2018) (holding that the plaintiff's "withdrawal, combined with his numerous psychological problems amounted to a 'sufficiently serious' medical problem" (citation omitted)). Medical Defendants do not make any argument as to the mental-state element. (*See* Med. Defs.' Mem. 9.) In any event, Plaintiff alleges that he was "confined to a bed for 2 weeks, affecting all [of his] daily normal activities," and that during that period he was in "great pain and mental agony"; that he "made numerous direct complaints" to the above-named Defendants when they made their "twice daily" medical rounds; that these Defendants "witness[ed]" Plaintiff's "extreme pain," and that he was denied "adequate pain medication." (Am. Compl. ¶¶ 58–62.) Construed liberally, the Court finds these allegations sufficient, at this stage, to plausibly state a deliberate

---

[4] Plaintiff does not appear to allege that Dr. Good, Nurse Sauer, or Nurse Crawley were involved at this stage.

indifference claim. *See Murphy v. Feliciano*, No. 17-CV-269, 2017 WL 3699353, at *6 (D. Conn. May 31, 2017) (holding deliberate indifference claim based on alcohol withdrawal where the plaintiff alleged that "the nurses did not offer him any treatment" and told him to "stop whining"), *on reconsideration*, 2017 WL 3698490 (D. Conn. Aug. 25, 2017), *appeal dismissed* 2018 WL 4705883 (2d Cir. Mar. 29, 2018); *see also Farmer*, 511 U.S. at 842 (holding that an official's awareness of the risk of serious harm can be established through "inference from circumstantial evidence," including "from the very fact that the risk was obvious"); *cf. Harris v. Nassau County*, No. 13-CV-4728, 2016 WL 3023265, at *10 (E.D.N.Y. May 24, 2016) (dismissing deliberate indifference claim based on withdrawal where the plaintiff did not allege that the defendants "subjectively knew about and disregarded his purportedly serious medical condition" (citation omitted)).

As to Plaintiff's alleged pre-existing physical and mental conditions upon admission to Sullivan, the Court notes that it is "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for [deliberate indifference] purposes." *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003) (citation omitted). Here, Plaintiff principally alleges that he had pain in his left shoulder upon arrival to Sullivan in December 2016; that he complained of the pain to Dr. Good and Nurses Guinan-Clark, Sauer, Gandulla, Altman, Crawley, and Moore; that he did not receive adequate care due to budgetary restrictions, and was only given Motrin and naproxen and a referral to a doctor; that, only in September 2017, some 10 months later, was he "finally sent out" to an outside doctor "for treatment" for his left shoulder and right knee; and that there he was informed that he had "severe arthritis couple[d] with [a] tear" and should undergo "reconstructive surgery." (Am. Compl. ¶¶ 308–15.) "Where a

plaintiff complains of delays or interruptions in providing needed medical treatment, the court should consider the severity of the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone in determining whether plaintiff has shown the existence of a sufficiently serious medical need." *Balkum v. Unger*, No. 06-CV-6578, 2009 WL 290439, at *5 (W.D.N.Y. Feb. 5, 2009). "[A] delay in treatment does not violate the constitution unless it involves an act or failure to act that evinces a conscious disregard of a substantial risk of serious harm." *Pabon v. Wright*, No. 99-CV-2196, 2004 WL 628784, at *8 (S.D.N.Y. Mar. 29, 2004) (citation and quotation marks omitted), *aff'd*, 459 F.3d 241 (2d Cir. 2006). "Here, Plaintiff has not alleged any conduct or behavior that would suggest the delay [in his shoulder treatment] was caused by [Defendants'] deliberate indifference." *Norman v. Marcilla*, No. 17-CV-9174, 2019 WL 3066426, at *5 (S.D.N.Y. July 11, 2019) (citation and quotation marks omitted). Indeed, Plaintiff alleges that he received pain medication and a referral; there are no allegations suggesting that any Defendant "took *affirmative* steps to ensure that [Plaintiff] would not receive [medical] treatment." *Myrie v. Calvo*, 615 F. Supp. 2d 246, 247–48 (S.D.N.Y. 2009) (emphasis added). "Absent such allegations, the . . . Amended Complaint suggests only that [Defendants] acted, or failed to act, with negligence amounting to medical malpractice, which is insufficient to state a claim for deliberate indifference." *Norman*, 2019 WL 3066426, at *5 (citation and quotation marks omitted). The Court therefore concludes that Plaintiff fails to state a deliberate indifference claim as to the delay in his shoulder treatment. *See Bell v. Jendell*, 980 F. Supp. 2d 555, 562 (S.D.N.Y. 2013) (collecting cases for the proposition that courts dismiss deliberate indifference claims in which inmates "merely allege a delay in the provision of

medication or treatment, but fail to allege that the delay was either intentional or reckless" (citations omitted)).[5]

### ii.  Illness After Meal

Plaintiff alleges that, on January 7, 2017, he became ill and experienced serious vomiting and diarrhea after eating lunch, that he was offered "pepto" by Calangelo, and that Nurse Altman refused to provide him with medical treatment.  (Am. Compl. ¶¶ 282–89.)  This isolated claim of food poisoning is not, without more factual detail relating to the duration, severity, and effects of the food poisoning, sufficient to satisfy the objective element.  *See Ballard v. Lane*, No. 18-CV-172, 2019 WL 1129158, at *3 (S.D.N.Y. Mar. 12, 2019) (holding objective element not satisfied as to food contamination claim where the plaintiff did not allege "any facts regarding the duration of the unsanitary condition"); *Roundtree v. City of New York*, No. 15-CV-8198, 2018 WL 1586473, at *8 (S.D.N.Y. Mar. 28, 2018) ("The sole incident of food poisoning did not pose an immediate danger to [the plaintiff's] health, especially when contrasted against other cases in which courts have found serious violations pertaining to spoiled food." (citation omitted)); *cf. Hudson v. City of New York*, No. 15-CV-4920, 2016 WL 3976399, at *5 (S.D.N.Y. June 23, 2016) ("[C]ourts have found that, under certain circumstances, the serving of contaminated meals satisfies the objective prong of a conditions-of-confinement claim." (collecting cases)), *adopted by* 2016 WL 3982512 (S.D.N.Y. July 21, 2016).  The Court therefore concludes that Plaintiff fails to state a deliberate indifference claim based on his alleged food poisoning.

---

[5] In his opposition, Plaintiff alleges for the first time that Nurse Guinan-Clark failed to treat his hepatitis C, and that he "got glaucoma as a consequence" of his high blood pressure in June 2018.  (Pl.'s Med. Mem. 5, 10, 12, 14.)  The Court will not consider these newly raised and conclusory claims at this time.

### iii.  Treatment Following Altercations

Plaintiff alleges three incidents in which he was assaulted and did not receive adequate medical treatment.

First, Plaintiff alleges that, in July 2017, he had an altercation with another inmate that caused him to sustain "a few scrapes and cuts" and exacerbated the pre-existing pain in his left shoulder.  (Am. Compl. ¶¶ 135–47.)  Plaintiff alleges that he saw Nurse Altman and that he was given "no medical treatment to his severe pain in his left shoulder."  (*Id.*)

Second, Plaintiff alleges that, also in July 2017, following an altercation with Minckler, he was sprayed with "O.C. spray" — that is, pepper spray — "directly into [his] eyes," face, and hair.  (*Id.* ¶ 165.)  This caused Plaintiff to struggle to breathe and caused his eyes to be in "excruciating" and "burning" pain.  (*Id.* ¶ 167.)  Plaintiff was taken to Nurse Altman and received "oxygen many times."  (*Id.* ¶ 168.)  However, although Nurse Altman "rins[ed]" Plaintiff's "face area and eyes," she did not "adequately decontaminate [P]laintiff's dreadlocks, even after [he] clearly complain[ed]."  (*Id.*)  Plaintiff was returned to his housing without being given a "cold shower to adequately decontaminate" his dreadlocks.  (*Id.* ¶ 169.)  Instead, Plaintiff was only given "hot shower[s]," which "reactivate[d]" and "retrigger[ed]" the "oil base" in the spray, further causing him pain.  (*Id.* ¶¶ 169–71.)  Plaintiff "complained directly" to numerous Defendants over the next two weeks to get a cold shower, but they "failed to remedy" the issue. (*Id.* ¶¶ 171–75.)

Third, Plaintiff alleges that, in January 2018, he was assaulted by Gabriel, Lekovic, and Kleingardner while in his cell, after which he "immediately started yelling . . . for medical."  (*Id.* ¶¶ 340–50.)  When another correction officer came, Plaintiff told him he "needed medical for his excruciating pain in his head and all over his body"; however, that officer did nothing.  (*Id.*

¶¶ 351–53.)  At some later point, Plaintiff spoke with Nurse Gandulla, who "failed to . . . bring" Plaintiff "to the medical station" to "examine [his] complete body, take vitals, and treat any and all obvious . . . [and] serious injuries and provide adequate pain medicine."  (*Id.* ¶ 354.)  Further, Plaintiff spoke with Nurse Moore, who also "failed to bring" Plaintiff "to the medical station." (*Id.* ¶ 355.)

As to the first and third incidents, the Court concludes that, even assuming Plaintiff was intentionally denied medical care such that the mental-state element would be satisfied, Plaintiff fails to allege facts plausibly suggesting that he suffered from an injury serious enough to satisfy the objective element.  *See Goodwin v. Kennedy*, No. 13-CV-1774, 2015 WL 1040663 at *12 (E.D.N.Y. Mar. 10, 2015) (holding that multiple cuts and lacerations did not satisfy objective element (collecting cases)); *Ford v. Phillips*, No. 05-CV-6646, 2007 WL 946703, at *12 (S.D.N.Y. Mar. 27, 2007) ("Abrasions, a minor bruise, slight bleeding[,] and scratches are not injuries that may produce death, degeneration or extreme pain . . . .").  This is not a case where Plaintiff has alleged that he sustained a broken bone, a dislocation, or some other serious physical injury.  *See, e.g.*, *Munoz v. Eliezer*, No. 16-CV-6049, 2018 WL 1626170, at *6 (S.D.N.Y. Mar. 30, 2018) (holding objective element satisfied where the plaintiff "alleged injuries of three-to-four broken ribs and a dislocated shoulder" (collecting cases)).  The Court therefore concludes that Plaintiff fails to state a deliberate indifference claim based on injuries suffered during the alleged July 2017 and January 2018 altercations.

As to second incident involving pepper spray, the Court concludes that Plaintiff fails, on the facts as alleged, to satisfy the objective element.  "[C]ourts within this Circuit have previously found that the temporary discomfort caused by pepper spray or mace does not constitute a 'sufficiently serious' injury."  *Lewis v. Clarkstown Police Dep't*, No. 11-CV-2487,

2014 WL 1364934, at *7 (S.D.N.Y. Mar. 31, 2014) (citations omitted), *on reconsideration*, 2014 WL 6883468 (S.D.N.Y. Dec. 8, 2014). Here, Plaintiff does not allege facts suggesting that he suffered permanent effects or serious injury from the pepper spray. The Court thus concludes that Plaintiff fails to state a deliberate indifference claim as to this incident. *See Wright v. Trapasso*, No. 15-CV-4428, 2018 WL 4688940, at *11 (E.D.N.Y. Sept. 28, 2018) (holding objective element not satisfied where the plaintiff did "not claim any lasting physical injuries from the pepper spray"); *Holmes v. City of New York*, No. 17-CV-3874, 2018 WL 4211311, at *7 (S.D.N.Y. Sept. 4, 2018) (holding objective element not satisfied where, "[w]hile undoubtedly uncomfortable and painful, the[] temporary effects of chemical spray are not serious medical needs because they do not rise to the level of producing death, degeneration, or extreme pain" (citation omitted)).

### iv. Seizures

Plaintiff alleges that he suffered seizures on November 6 and 12, 2017. (Am. Compl. ¶¶ 320, 332–34.) However, Plaintiff does not allege that he did not receive treatment. As to the November 6, 2017 seizure, Plaintiff acknowledges that, notwithstanding Nurse Sauer's debate with Harrell "over the cheapest way to transport [him] to the hospital," he was in fact taken to a hospital. (*Id.* ¶¶ 321, 324–25.) And as to the November 12, 2017 seizure, Plaintiff acknowledges that, notwithstanding Nurse Crawley's alleged failure to provide him medical care, Nurse Moore came and took Plaintiff's vitals. (*Id.* ¶¶ 334–43.) To the extent Plaintiff claims that the treatment provided was inadequate, Plaintiff fails to allege what harm he suffered as a result of the seizures and subsequent treatment. *Youngblood v. Artus*, No. 10-CV-752, 2011 WL 6337774, at *7–8 (N.D.N.Y. Dec. 19, 2011) ("[The] [p]laintiff failed to allege that he suffered harm as a result of [the defendant's] failure to give him one dose of his seizure

medication." (citation omitted)).  And to the extent Plaintiff's claim is focused on the delay in medical treatment following the seizures, "temporary delays . . . [in] medical treatment have been found to satisfy the objective seriousness requirement" only where "they have involved either a needlessly prolonged period of delay, or a delay which caused extreme pain or exacerbated a serious illness." *Morgan v. Shivers*, No. 14-CV-7921, 2018 WL 618451, at *8 (S.D.N.Y. Jan. 29, 2018) (citation and quotation marks omitted).  Plaintiff fails to allege how long the alleged delay lasted and, more importantly, how the delay caused him extreme pain or exacerbated a serious medical condition.  Without these necessary factual details, "allegations of a limited delay . . . are insufficient to plead an objectively serious risk to Plaintiff's health rising to the level of a constitutional claim." *Fleming v. City of New York*, No. 18-CV-4866, 2019 WL 4392522, at *11 (S.D.N.Y. Aug. 27, 2019) (citation and quotation marks omitted).  The Court therefore concludes that the Amended Complaint fails to state a deliberate indifference claim as to the medical treatment provided following his November 2017 seizures.

### c.  Conditions of Confinement Claims

Supervisor and Correction Officer Defendants argue that Plaintiff fails to state a claim for unconstitutional conditions of confinement.  (*See* Sup. Defs.' Mem. 12; CO Defs.' Mem. 22.)

Plaintiff raises a litany of allegations against many aspects of Sullivan's conditions of confinement.  First, Plaintiff alleges that the conditions in Sullivan's modular housing units are inadequate.  According to the Amended Complaint, while housed in the M-1 unit, which provides a "constant watch" over inmates dealing with mental health problems, Plaintiff was housed next to "seriously mentally ill prisoners" and was thus "expose[d] to screaming and feces-smearing" as well as "constant, loud banging."  (Am. Compl. ¶¶ 265, 267, 366–67.) Further, whenever Plaintiff was placed in one of Sullivan's other modular units, there was

inadequate ventilation, "widespread" mold, drastic heat changes, bad smell, and "brown," "foul tasting" water that is "burning when dr[u]nk," "upset[s] [the] stomach," and causes "skin rashes." (*Id.* ¶¶ 261–67, 366–69, 368–73.) The Court finds, "[a]t this stage in the litigation, [that] Plaintiff has alleged the objective prong of his conditions of confinement claim," as he "has alleged that he was exposed to human excrement and bodily fluids in a poorly ventilated cell over the course of multiple days." *Barnes v. County of Monroe*, 85 F. Supp. 3d 696, 738 (W.D.N.Y. 2015); *see also Hamilton v. Smith*, No. 06-CV-805, 2009 WL 3199531, at *16 (N.D.N.Y. Jan. 13, 2009) (holding objective element satisfied where the plaintiff produced evidence of undrinkable water and inadequate ventilation), *adopted by* 2009 WL 3199520 (N.D.N.Y. Sept. 30, 2009); *cf. Little v. Mun. Corp.*, 51 F. Supp. 3d 473, 491 (S.D.N.Y. 2014) (noting that "courts in the Second Circuit have repeatedly held sporadic or brief exposure to waste does not amount to a constitutional violation" (collecting cases)). Further, "[a]lthough Plaintiff has not specifically alleged that Defendants had knowledge of [these] condition[s], Defendants' knowledge may be inferred by the simple fact that these Defendants must have viewed the conditions of the cell when they placed Plaintiff in it." *Barnes*, 85 F. Supp. 3d at 738 (citation omitted); *see also Brock*, 315 F.3d at 164 ("[E]vidence that the risk was obvious or otherwise must have been known to a defendant is sufficient to permit a jury to conclude that the defendant was actually aware of it." (citation omitted)). Accordingly, the Court declines to dismiss Plaintiff's conditions-of-confinement claim as Sullivan's modular housing units.

Separately, Plaintiff alleges that the food generally provided to inmates at Sullivan — whose preparation is overseen by Fraser — is "spoiled, raw, cold, [and] tampered with," thus causing severe pain and sickness. (Am. Compl. ¶¶ 370–71.) This claim requires further factual development. Plaintiff has "not stated a claim under the Fourteenth Amendment, which requires

that he allege deprivation of 'the measure of food necessary to maintain health,' and he has not [plausibly] stated a claim based on the denial of food." *Corley v. City of New York*, No. 14-CV-3202, 2017 WL 4357662, at *14 (S.D.N.Y. Sept. 28, 2017) (citation omitted). Accordingly, this claim is dismissed.

Plaintiff also alleges that throughout Sullivan there were "drain flies" and "other vermin" in the shower, and that Sullivan attempted to spray the area without success. (Am. Compl. ¶ 374.) This claim too requires further factual development. "The mere presence of vermin in a detainee's housing area does not constitute a denial of the minimal civilized measure of life's necessities." *Mena v. City of New York*, No. 12-CV-28, 2014 WL 2968513, at *10 (S.D.N.Y. June 27, 2014) (citation and quotation marks omitted). Further, Plaintiff acknowledges that Sullivan took steps to combat the alleged problem; there are no allegations suggesting that any Defendant "recklessly failed to act with reasonable care to mitigate the risk that the condition posed" such that Plaintiff could satisfy the mental-state element. *Darnell*, 849 F.3d at 35. Accordingly, this claim is dismissed.

Finally, Plaintiff alleges that for one day his toilet was dysfunctional and overflowing, causing his cell to smell. (Am. Compl. ¶¶ 150–69.) Plaintiff fails to allege facts plausibly suggesting that this condition satisfies the objective element required to state a conditions of confinement claim. *See Burroughs v. Mitchell*, 325 F. Supp. 3d 249, 277 (N.D.N.Y. 2018) (dismissing conditions-of-confinement claim based on lack of "functioning toilet or running water for four days" (citation omitted)); *Florio v. Canty*, 954 F. Supp. 2d 227, 235–36 (S.D.N.Y. 2013) (holding that two instances of confinement in cells with overflowing toilets and being forced to walk through ankle-high human waste was "simply too minor to state an Eighth Amendment claim"). Accordingly, this claim is dismissed.

<u>d. Failure-To-Protect Claims</u>

It is well-established that "prison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 (citation, quotation marks, and alteration omitted). To state a claim based on prison official's failure to protect an inmate from attack (or failed to intervene to stop an attack), a plaintiff must plausibly allege that the prison official acted with "deliberate indifference to a substantial risk of serious harm to an inmate." *Taylor v. City of New York*, No. 16-CV-7857, 2018 WL 1737626, at *11 (S.D.N.Y. Mar. 27, 2018) (quoting *Farmer*, 511 U.S. at 828).

Plaintiff describes three incidents in which Sullivan correction officers allegedly failed to protect his safety.

First, Plaintiff alleges that, in January 2017, while housed in the M-9 modular unit, he was the "only black [inmate]" in the six-person unit and "was having serious racial issues with" three other inmates there. (Am. Compl. ¶¶ 78–80, 82.) Plaintiff complained to Harrell and Calangelo about harassment from the other inmates, but they did not act. (*Id.* ¶ 81.) On January 18, 2017, while "locked defenseless" in a room showering, these other inmates verbally harassed Plaintiff with racist language, "thr[e]w urine" on him, and "sp[a]t[]" on him; Plaintiff "had to yell a good 20 minutes before [Calangelo] responded," despite the fact that the office was "10 feet from the" shower area. (*Id.* ¶¶ 80–87.) Although Plaintiff did not allege that he suffered a serious physical injury as a result of the incident, "prison officials have a constitutional duty to act reasonably to ensure a safe environment for a prisoner when they are aware that there is a significant risk of serious injury to that prisoner," and "[t]he failure to do so violates that prisoner's rights, whether or not an attack actually occurs, and if it does occur, whether or not the injuries suffered in an attack are serious." *Douglas v. Annuci*, No. 14-CV-6018, 2017 WL

5159194, at \*4 (W.D.N.Y. Nov. 7, 2017). Therefore, construed liberally, Plaintiff has sufficiently stated a claim of failure to protect, given Calangelo's prior notice of racial tension in the unit via Plaintiff's recent complaints, the length of the alleged assault, and Calangelo's alleged proximity to the incident. *See Lehal v. United States*, No. 13-CV-3923, 2015 WL 9592706, at \*8 (S.D.N.Y. Dec. 29, 2015) ("Courts may look to the length of the incident, inter alia, to determine whether an officer had a realistic opportunity to intervene." (citation and italics omitted)).

Second, Plaintiff alleges that, on February 10, 2017, he was involved in a physical altercation with another inmate, who was the aggressor, while Nash "was just standing" nearby "enjoying the spectacle" and failed to intervene. (Am. Compl. ¶¶ 100–05.) Only after 10 minutes did Nash "call[] for a code 7" alarm. (*Id.* ¶ 106.) As with the first incident, Plaintiff sufficiently states a claim as to this assault, as he alleges that Nash "witnessed the attack on [him] and allegedly failed to take action to prevent it." *Taylor*, 2018 WL 1737626, at \*12.

Third, Plaintiff alleges that, in early July 2017, he and another inmate got in an argument while in their cells. (Am. Compl. ¶ 130.) Compasso came by, but did nothing except "stare[] . . . for a couple seconds" and then leave. (*Id.* ¶ 133.) Some days later, Plaintiff and the inmate again began arguing, which turned into a physical altercation begun by the other inmate. (*Id.* ¶¶ 135–39.) Plaintiff alleges that Compasso, who was not present at the physical altercation, "failed to remove[] a . . . potential fight risk." (*Id.* ¶ 134.) Yet, "an inmate's communications about generalized safety concerns or vague concerns of future assault by unknown individuals are insufficient to provide knowledge that the inmate is subject to a substantial risk of serious harm." *Anselmo v. Kirkpatrick*, No. 19-CV-350, 2019 WL 2137469, at \*4 (N.D.N.Y. May 16, 2019) (collecting cases). Rather, a failure-to-protect claim requires the plaintiff "allege[] that he

informed [the prison official] about a specific fear of assault and [was] then assaulted." *Tubbs v. Venettozzi*, No. 19-CV-126, 2019 WL 2610942, at *5 (N.D.N.Y. June 26, 2019); *see also Velez v. City of New York*, No. 17-CV-9871, 2019 WL 3495642, at *4 (S.D.N.Y. Aug. 1, 2019) ("Those cases which have found officers potentially liable for failing to prevent an attack involved clear and specific threats against an inmate." (collecting cases)). Here, Plaintiff does not allege that Compasso knew that the other inmate posed a specific and substantial risk to Plaintiff's safety, nor does he allege that Compasso was present at the scene of the physical altercation and in a position to intervene. Accordingly, Plaintiff fails to state a failure-to-protect claim based on this incident. *See Rivera v. Connolly*, No. 18-CV-3958, 2019 WL 3564559, at *5 (S.D.N.Y. Aug. 6, 2019) ("[T]he amended complaint does not allege anyone warned [the defendant] that another inmate posed a substantial risk of serious harm to [the] plaintiff's safety, nor does it contain any factual allegation suggesting [the defendant] otherwise knew or learned of such a risk." (original alteration omitted)); *Plass v. New York*, No. 19-CV-553, 2019 WL 3561760, at *3 (N.D.N.Y. Aug. 6, 2019) (holding insufficient allegation that "officers saw an unidentified inmate attempt to cut [the plaintiff] before the attack," because there was no plausible suggestion "that the officers knew of an excessive risk to [the plaintiff's] health or safety" (citation omitted)); *Haughton v. Clinton*, No. 15-CV-1160, 2015 WL 9244398, at *2 (S.D.N.Y. Dec. 17, 2015) (dismissing failure-to-protect claim where the plaintiff only told the prison official that he "feared for [his] safety," as that statement was "too conclusory for [the official] to have inferred the existence of such a substantial risk"); *cf. Grant v. Hogue*, No. 17-CV-3609, 2019 WL 3066378, at *7 (S.D.N.Y. July 12, 2019) (declining to grant summary judgment on failure-to-protect claim where the "[p]laintiff's testimony arguably describe[d] a previous altercation with [the other inmate] coupled with a complaint by [the] plaintiff to prison

officials or a request to be separated from the attacker," and where the plaintiff "arguably attribute[d] to [the other inmate] more than verbal threats alone" because "he sa[id] [the other inmate] came within three feet of [him] in a fighting stance and then tried to attack [him] through a group of correction officers" (citations, quotation marks, and alterations omitted)).

### 5. Excessive Force Claims

#### a. Applicable Law

Excessive force claims brought by pretrial detainees "are analyzed under the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishment Clause of the Eighth Amendment." *Holland v. City of New York*, 197 F. Supp. 3d 529, 545 (S.D.N.Y. 2016) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)). The Supreme Court has held that for "excessive force claims of pretrial detainees . . . , 'the appropriate standard is solely an objective one.'" *Id.* (alteration omitted) (citing *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015)). To establish a claim for excessive force, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley*, 135 S. Ct. at 2473; *see also Edrei v. Maguire*, 892 F.3d 525, 537 (2d Cir. 2018) (holding that "*Kingsley* provides the appropriate standard for all excessive force claims brought under the Fourteenth Amendment"). Considerations that may bear on the reasonableness of the force used include:

> [T]he relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.*; *see also Frost v. Davis*, No. 17-CV-8418, 2019 WL 4512620, at *6 (S.D.N.Y. Sept. 18, 2019) ("The determination of reasonableness must be made from the perspective of a reasonable

officer on the scene, including what the officer knew at the time." (citation, alterations, and quotation marks omitted).

### b. Application

Plaintiff alleges two incidents of excessive force. First, Plaintiff alleges that, on July 13, 2017, he complained to certain Defendants about a dysfunctional toilet, but they failed to remedy the problem. (Am. Compl. ¶¶ 149–59.) Eventually, Gray and Minckler came to investigate, and used racial slurs against Plaintiff. (*Id.* ¶¶ 160–63.) They demanded Plaintiff "put [his] black fucking hands [through] the bars," and, when Plaintiff "approach[ed] the front of his cell to comply," Minckler "spray[ed]" the "fully cooperative" Plaintiff with pepper spray into his face and eyes and onto his dreadlocks. (*Id.* ¶ 165.) Plaintiff was "roughly handcuffed and brought to the medical station." (*Id.* ¶ 166.) Plaintiff "was barely able to breathe" and his eyes were "burning" and in "excruciating pain." (*Id.* ¶ 167.)

Second, Plaintiff alleges that, on January 5, 2018, while in the M-1 unit, Gabriel, Lekovic, and Kleingardner came to Plaintiff's cell and used racist and harassing language to him. (*Id.* ¶¶ 338–40, 343, 348.) When Plaintiff asked Gabriel "why [he was] by [Plaintiff's] cell" given that Plaintiff had "open complaints against [him]," the officers pulled out their handcuffs and yelled at Plaintiff to place his hands through the cell door chute, a "prohibited" procedure. (*Id.* ¶¶ 340–42.) Plaintiff did so, and Gabriel placed handcuffs on Plaintiff, thus "cutting off the circulation," and "yank[ed]" Plaintiff out of his cell "without standard video recording safety measure procedures." (*Id.* ¶¶ 344–45.) Gabriel, Lekovic, and Kleingardner took Plaintiff "to the other end of the tier" and then searched Plainiff's cell "without any security camera." (*Id.* ¶ 346.) Plaintiff complained that this was a violation, but Gabriel yelled back, using racist language. (*Id.* ¶¶ 347–48.) Gabriel, Lekovic, and Kleingardner then "used brutal force" on the

"fully cooperative" Plaintiff by repeatedly "punching and kicking [him] upon the head, chest, arms, legs[,] and back," after which they dragged him back into the cell. (*Id.* ¶¶ 349–50.)

Correction Officer Defendants argue — citing case law from, most recently, 1993 — that Plaintiff fails to state an excessive force claim because he does not establish that "Defendants' actions, even if malevolent, constituted a malicious or sadistic effort to inflict harm." (CO Defs.' Mem. 25.) Incredibly, given the severity of Plaintiff's allegations, this is the full extent of Correction Officer Defendants' argument; they fail entirely to meaningfully apply the (outdated) case law to the facts of this case.

In any event, the Court concludes that Plaintiff has plausibly stated an excessive force claim. As to the alleged July 2013 pepper spray incident, while "the use of a single burst of a chemical agent, which is not a dangerous quantity, is a constitutionally acceptable means of controlling an unruly or disruptive inmate," *Frost*, 2019 WL 4512620, at *7 (citation and quotation marks omitted), here, Plaintiff squarely alleges that he was fully cooperative, that Minckler and Gray were on the other side of the cell bars (and thus not plausibly in danger), and that the pepper spray was intentionally sprayed directly into Plaintiff's eyes and face and onto his hair, causing him excruciating pain that lasted for two weeks. This is sufficient. *See Shabazz v. Semple*, No. 17-CV-904, 2019 WL 1979959, at *4 (D. Conn. May 3, 2019) ("[The plaintiff] has plausibly alleged that [the prison official] used an unreasonable and unnecessary amount of force in spraying him in the face when he was not resisting but was attempting to follow the orders of [another prison official], who was repeatedly directing him to put his arms behind his back, and that [the first prison official] sprayed him with mace to cause him pain rather than for a legitimate penological purpose." (citation omitted)); *cf. Campbell v. Hanson*, No. 17-CV-1024, 2019 WL 2717691, at *4 (S.D.N.Y. June 28, 2019) (holding, on motion for summary judgment,

that the plaintiff failed to state an excessive force claim based on use of pepper spray where there was no dispute that the prison official used the "spray in an effort to break up the altercation," where the plaintiff acknowledged "that he heard [the official] issue a verbal warning," and where there was no "evidence indicating that the [pepper] spray was deployed in an effort to cause harm rather than in a good faith effort to maintain and restore discipline" (citation and quotation marks omitted)). Similarly, as to the alleged January 2018 assault, Plaintiff alleges that Gabriel, Lekovic, and Kleingardner assaulted a fully cooperative inmate who posed no risk to prison officers. This is sufficient. *See Gulley v. Ogando*, No. 19-CV-612, 2019 WL 2502753, at *3 (D. Conn. June 17, 2019) ("Given that . . . [the plaintiff] has not alleged that [he] made any attempt to resist the efforts of officers . . . , his allegations regarding the use of kicks and punches to his head, face, back and neck by [correction officers] . . . plausibly state a claim that the force used was intended to cause him pain or discomfort rather than to maintain discipline or security." (citations omitted)).[6]

Accordingly, the Court holds that Plaintiff plausibly states an excessive force claim as to the July 2017 pepper spray incident and the January 2018 assault.

### 6. Procedural Due Process Claim

Supervisor Defendants argue that Plaintiff fails to state a procedural due process claim. (Sup. Defs.' Mem. 10.)

---

[6] To the extent plaintiff asserts an excessive force claim based on rough handcuffing, that allegation fails, as Plaintiff fails to allege any injury caused by the handcuffing. *See Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 468–69 (S.D.N.Y. 2008) ("[T]ight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort." (collecting cases)).

<u>a.  Applicable Law</u>

"To present a due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process."  *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004) (citation, alterations, and quotation marks omitted).  The Supreme Court has held that inmates retain due process rights in prison disciplinary proceedings.  *See Wolff v. McDonnell*, 418 U.S. 539, 563–72 (1974) (describing the procedural protections that inmates are to receive when subject to significant disciplinary punishment).  However, "[p]rison discipline implicates a liberty interest [only] when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'"  *Ortiz*, 380 F.3d at 654 (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)).

The Second Circuit has explained that "[t]he length of disciplinary confinement is one of the guiding factors in applying *Sandin*'s 'atypical and significant hardship' test."  *Hanrahan v. Doling*, 331 F.3d 93, 97 (2d Cir. 2003) (citation omitted).  The duration of disciplinary confinement, however, is "not the only relevant factor," and the Second Circuit has "explicitly avoided a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights."  *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (citations and quotation marks omitted).  As a guidepost, the Second Circuit has instructed that "[w]here the plaintiff was confined for an intermediate duration — between 101 and 305 days — development of a detailed record of the conditions of the confinement relative to ordinary prison conditions is required."  *Id.* at 64–65 (citation and quotation marks omitted).  Even a confinement period of 280 days is not necessarily evidence of deprivation of a liberty interest if the detainee fails to make specific allegations about the nature of the confinement, including time spent "within the cell, hygienic conditions, access to programs, as well as other conditions."  *Dawkins v. Gonyea*,

646 F. Supp. 2d 594, 607 (S.D.N.Y. 2009). The Second Circuit has also suggested that "evidence of the psychological effects of prolonged confinement in isolation" may be helpful in developing the necessary record. *Colon v. Howard*, 215 F.3d 227, 232 (2d Cir. 2000).

Regarding the process an inmate is due, a disciplinary hearing comports with due process when an inmate receives "advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004) (citation omitted). "In the context of prison disciplinary hearings, the Second Circuit has said that its 'conception of an impartial decisionmaker is one who, inter alia, does not prejudge the evidence and who cannot say, with utter certainty, how he would assess evidence he has not yet seen.'" *Rahman v. Acevedo*, No. 08-CV-4368, 2011 WL 6028212, at *7 (S.D.N.Y. Dec. 5, 2011) (italics and alterations omitted) (quoting *Patterson v. Coughlin*, 905 F.2d 564, 570 (2d Cir. 1990)).

### b. Inmate Grievance Procedure

As Correction Officer and Supervisor Defendants argue, (Sup. Defs.' Mem. 25), Plaintiff's general complaints about the adequacy of the Sullivan inmate grievance procedure and Sullivan officials' non-compliance with that procedure, (*see* Am. Compl. ¶¶ 279–80, 290, 376–400), must be dismissed. "A prisoner has no constitutional right to a prison grievance procedure or to have his grievances investigated." *Hayes v. County of Sullivan*, 853 F. Supp. 2d 400, 434 (S.D.N.Y. 2012) (citations omitted). Put differently, "[i]nmate grievance programs created by state law are not required by the Constitution, and consequently, allegations that prison officials violated those procedures do not give rise to a cognizable § 1983 claim." *Means v. Rockland*

*County Corr. Facility*, No. 18-CV-8290, 2019 WL 1596489, at *9 (S.D.N.Y. Apr. 15, 2019)

(citation, original alterations, and quotation marks omitted).

### c. Disciplinary Proceedings

Plaintiff makes seven allegations of disciplinary proceedings that were procedurally

improper. The Court addresses them in chronological order.

### i. First Disciplinary Hearing

Plaintiff first alleges that, on December 31, 2016, Cole and Lynch gave him a

"fabricated" misbehavior report charging him with assault and violent conduct. (Am. Compl.

17–18.) A disciplinary hearing overseen by Whalan was held on January 3, 2017. (*Id.* ¶¶ 68–

69.) Whalan allegedly refused Plaintiff to have assistance, to call witnesses, and to view video

footage, and further stated that Plaintiff "ha[s] no rights in [Sullivan]." (*Id.* ¶¶ 67, 69–75.)

Whalen found Plaintiff guilty and sentenced him to 30 days in punitive segregation. (*Id.* ¶ 73.)

Plaintiff appealed, and Bini affirmed. (*Id.* ¶¶ 76–77.)

A "30-day confinement is right at the cut-off suggested by the Second Circuit for a

presumptively typical confinement." *Thomas v. DeCastro*, No. 14-CV-6409, 2018 WL 1322207,

at *7 (S.D.N.Y. Mar. 13, 2018) (citations, alterations, and quotation marks omitted). That is, a

30-day . . . confinement *alone* is insufficient to create a liberty interest triggering due process

protections." *Colon*, 344 F. Supp. 3d at 633 (emphasis added) (collecting cases); *see also Brown

v. Murphy*, No. 16-CV-710, 2019 WL 2325777, at *2 (S.D.N.Y. May 30, 2019) ("Courts in this

Circuit have consistently found that such limited periods of segregation do not, *without more*,

constitute 'atypical and significant hardships.'" (emphasis added) (citation omitted)). Here,

however, "construed liberally," *Sykes*, 723 F.3d at 403, Plaintiff plausibly alleges that he

"endured unusual . . . conditions" during his confinement in punitive segregation. *Palmer*, 364

F.3d at 66. In particular, Plaintiff alleges that of the six inmates in punitive segregation, he was the "only black" inmate and that he had "racial issues" with three other inmates, (Am. Compl. ¶¶ 79–82); that he endured racist harassment from the other inmates, including verbal harassment and urine and spit being thrown on him while in the shower, (*id.* ¶¶ 81–87); that he yelled for help for twenty minutes before a prison official responded, (*id.* ¶ 85); that the incident caused Plaintiff "extreme mental anguish" and "trigger[ed] [his] high blood pressure . . . [and] migrain[e]s," such that it Plaintiff suffered "severe, crippling pain from the migrain[e]s for 2 days," (*id.* ¶ 86); and that he "directly complained" about the other inmates to Harrell and Calangelo, who apparently did not remedy the situation, (*id.* ¶ 81). Taken together, the Court concludes that Plaintiff — who has already plausibly stated a failure-to-protect claim based on the same incident — has plausibly described an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life," *Ortiz*, 380 F.3d at 654 (citation omitted), such that Plaintiff had a protected liberty interest.

Because Plaintiff has plausibly alleged "that he possessed a liberty interest" and that Whalan "deprived him of that interest as a result of insufficient process" in his disciplinary hearing, *id.*, the Court declines to dismiss Plaintiff's due process claim based on his January 3, 2017 disciplinary hearing.

### ii. Second Disciplinary Hearing

Second, Plaintiff alleges that, on January 18, 2017, Calangelo wrote Plaintiff up on a "fabricated" misbehavior report. (Am. Compl. ¶ 90.) A disciplinary hearing overseen by Whalan was held on January 22, 2017. (*Id.* ¶ 91.) Plaintiff again objected that he was being denied his right to assistance, to call witnesses, to view video footage, and to present evidence,

but Whalan found Plaintiff guilty and sentenced him to 10 days in punitive segregation.  (*Id.* ¶¶ 92–96, 98.)  Plaintiff appealed, and Bini affirmed.  (*Id.* ¶¶ 97, 99.)

"Absent a detailed factual record, courts typically affirm dismissals of due process claims where the period of time spent in [restrictive housing] was short — *e.g.*, thirty days — and there was no indication of unusual conditions."  *Houston v. Cotter*, 7 F. Supp. 3d 283, 298 (E.D.N.Y. 2014) (citing *Palmer*, 364 F.3d at 66).  Here, however, as above, Plaintiff plausibly alleges facts suggesting that he suffered an "atypical and significant hardship" during this period in punitive segregation.  *Ortiz*, 380 F.3d at 654 (citation omitted).  In particular, Plaintiff alleges that, on February 10, 2017, he was "attacked" by another inmate for "for a good 10 minutes" while "Nash was just standing at the control[] door box area enjoying the spectacle."  (Am. Compl. ¶¶ 100–06.)  Nash "fail[ed] to quickly and reasonably respond" and "delay[ed] [in calling] a code 7" alarm.  (*Id.* ¶¶ 104, 107.)  Taken together, the Court concludes that Plaintiff — who has already plausibly stated a failure-to-protect claim based on the same incident — has plausibly described an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life," *Ortiz*, 380 F.3d at 654 (citation omitted), such that Plaintiff had a protected liberty interest.

Because Plaintiff has plausibly alleged "that he possessed a liberty interest" and that Whalan "deprived him of that interest as a result of insufficient process" in his disciplinary hearing, *id.*, the Court declines to dismiss Plaintiff's due process claim based on his January 22, 2017 disciplinary hearing.

### iii.  Third, Fourth, and Fifth Disciplinary Hearings

Third, Plaintiff alleges that, on February 10, 2017, Nash "fabricated a misbehavior report" charging Plaintiff with being the aggressor.  (Am. Compl. ¶ 113.)  A disciplinary hearing overseen by Whalan was held on February 20, 2017.  (*Id.* ¶¶ 115–16.)  Plaintiff again objected

that he was denied his right to assistance, to call and cross-examine witnesses, but Whalan found Plaintiff guilty and sentenced him to 30 days in punitive segregation. (*Id.* ¶¶ 117–24.) Plaintiff appealed, and Bini affirmed. (*Id.* ¶ 125.) As noted, "a 30-day . . . confinement *alone* is insufficient to create a liberty interest triggering due process protections." *Colon*, 344 F. Supp. 3d at 633 (citations omitted). Here, Plaintiff has not alleged any facts suggesting that he suffered an "atypical and significant hardship" during this period in punitive segregation, *Ortiz*, 380 F.3d at 654 (citation omitted), such that he had a protected liberty interest. Accordingly, the Court dismisses Plaintiff's due process claim based on his February 20, 2017 disciplinary hearing.

Fourth, Plaintiff alleges that, on July 13, 2017, Minckler and Besson served Plaintiff with two false misbehavior reports. (Am. Compl. ¶¶ 176, 178.) A disciplinary hearing overseen by Whalan was held on July 17, 2017. (*Id.* ¶ 178.) Plaintiff again objected that he was denied his right to assistance and to meaningfully prepare for the hearing. (*Id.* ¶¶ 176–84.) Whalen dismissed the misbehavior report filed by Besson, but found Plaintiff guilty of that filed by Minckler, and sentenced Plaintiff to 90 days in punitive segregation. (*Id.* ¶¶ 185–87). Plaintiff appealed, and Bini affirmed. (*Id.* ¶¶ 188–89.) Yet, "90 days" in restrictive housing, "without additional allegations, is insufficient to establish that [Plaintiff] suffered from an atypical and significant confinement," which Plaintiff has not done. *Elleby v. Martucello*, No. 16-CV-1335, 2018 WL 3769965, at *3 (N.D.N.Y. Aug. 9, 2018). Accordingly, the Court dismisses Plaintiff's due process claim based on his July 17, 2017 disciplinary hearing. *See Vogelfang v. Capra*, 889 F. Supp. 2d 489, 511 (S.D.N.Y. 2012) (finding three months of confinement did not trigger due process protections where the plaintiff "[did] not plead any other facts tending to show that her SHU confinement was uniquely harsh").

Fifth, Plaintiff alleges that in October 2017, Lewis served Plaintiff with a fabricated and retaliatory misbehavior report. (Am. Compl. ¶¶ 208–09.) A disciplinary hearing overseen by Wilcox was held on October 24, 2017. (*Id.* ¶ 195.) Plaintiff objected on grounds that Wilcox could not be impartial because Plaintiff had recently filed this Action. (*Id.* ¶ 196.) Wilcox rejected the objection and further denied Plaintiff the ability to call witnesses, present exculpatory information, and be heard. (*Id.* ¶¶ 197, 199–200.) Wilcox found Plaintiff guilty and sentenced him to 30 days in punitive segregation. (*Id.* ¶ 198.) Plaintiff appealed, and Bini affirmed. (*Id.* ¶ 210.) As above, "a 30-day . . . confinement alone is insufficient to create a liberty interest triggering due process protections," *Colon*, 344 F. Supp. 3d at 633 (citations omitted), and Plaintiff alleges no facts suggesting that he suffered an "atypical and significant hardship" during this period, *Ortiz*, 380 F.3d at 654 (citation omitted), such that he had a protected liberty interest. Accordingly, the Court dismisses Plaintiff's due process claim based on his October 24, 2017 disciplinary hearing.

### iv. Sixth, Seventh, and Eighth Disciplinary Hearings

Sixth, Plaintiff alleges that, on October 30, 2017, Kleingardner served Plaintiff with a false and retaliatory misbehavior report. (Am. Compl. ¶¶ 222–24, 227.) A disciplinary hearing overseen by Wilcox was held on November 4, 2017. (*Id.* ¶ 227.) Plaintiff unsuccessfully "objected to not being provided with a 24 hour notice of [the] misbehavior report," to being denied the ability to gather evidence and otherwise defend his case, and to the retaliatory nature of the misbehavior report given Plaintiff's recent filing of this Action. (*Id.* ¶¶ 228–34.) Wilcox found Plaintiff guilty, Plaintiff appealed, and Bini affirmed. (*Id.* ¶ 236.) It appears that Wilcox sentenced Plaintiff to 180 days in punitive segregation. (*Id.* ¶ 232.)

Finally, seventh and eighth, Plaintiff alleges that, on December 9, 2017, he received notice of two disciplinary proceedings held against him without his knowledge or presence. (*Id.* ¶¶ 238–39.) In those hearings, which were allegedly held in early December, Wilcox (1) found Plaintiff guilty of unspecified charges contained in a misbehavior report filed by Field, and imposed a punishment of 180 days in punitive segregation; and (2) found Plaintiff guilty of unspecified charges contained in misbehavior reports filed by Crawley, Rodriguez, Gorr, and Olsen, and imposed a punishment of "an additional" 150 days in punitive segregation. (*Id.* ¶¶ 240–42.) When Plaintiff learned of the hearings, he appealed, but Bini did not respond. (*Id.* ¶¶ 244–45.) Plaintiff alleges that the charges in these misbehavior reports were fabrications. (*Id.* ¶¶ 247–53.)

As noted, "[w]here the plaintiff was confined for an intermediate duration — between 101 and 305 days — development of a detailed record of the conditions of the confinement relative to ordinary prison conditions is required." *Palmer*, 364 F.3d at 64–65 (citation and quotation marks omitted). Here, although it is not entirely clear, Plaintiff plausibly alleges that he received three sentences in the "intermediate" range. Accordingly, the Court declines to dismiss Plaintiff's procedural due process claims based on his November 4, 2017 and December 2017 disciplinary hearings. *See Koehl v. Bernstein*, No. 10-CV-3808, 2011 WL 2436817, at *7 (S.D.N.Y. June 17, 2011) (concluding that allegations of 120 days in restrictive housing required discovery and development of record to determine "whether this intermediate sentence constitute[d] an atypical and significant hardship"), *adopted by* 2011 WL 4390007 (S.D.N.Y. Sept. 21, 2011); *cf. Brooks v. DiFasi*, No. 93-CV-197, 1997 WL 436750, at *4 (W.D.N.Y. July 30, 1997) (holding, on motion for summary judgment and detailed factual record, that "the plaintiff has failed to factually establish a genuine issue as to whether the conditions of

confinement he experienced during the 180 days of keeplock confinement created significant and atypical hardship in comparison to the ordinary incidents of prison life").

### 7.  First Amendment Right of Access Claim

Plaintiff alleges that he commenced this Action in October 2017 by filing for a TRO and preliminary injunction, but that he was unable to file a complaint because of inadequacies with the Sullivan law library.  (Am. Compl. ¶¶ 45–47, 375, 402–09).  To the extent Plaintiff alleges that this denied him his First Amendment right to access to the courts, Plaintiff must, among other things, allege "that the defendant's actions resulted in *actual injury* to the plaintiff such as the dismissal of an otherwise meritorious legal claim."  *Cancel v. Goord*, No. 00-CV-2042, 2001 WL 303713, at *4 (S.D.N.Y. Mar. 29, 2001) (emphasis added) (citing *Lewis v. Casey*, 518 U.S. 343, 351 (1996)).  Actual injury includes "claims that systemic official action frustrates a plaintiff . . . in preparing and filing suits at the present time," and "claims not in aid of a class of suits yet to be litigated, but of specific cases that cannot now be tried (or tried with all material evidence), no matter what official action may be in the future."  *Christopher v. Harbury*, 536 U.S. 403, 413–14 (2002) (collecting cases).  "A hypothetical injury is not sufficient."  *Amaker v. Haponik*, No. 98-CV-2663, 1999 WL 76798, at *3 (S.D.N.Y. Feb. 17, 1999).  Here, Plaintiff cannot show actual injury, as he in fact filed this Action.  Therefore, this claim is dismissed.  *See Moore v. Westchester County*, No. 18-CV-7782, 2019 WL 3889859, at *3 (S.D.N.Y. Aug. 19, 2019) (dismissing access-to-courts claim where the plaintiff was able to file the action (collecting cases)).

### 8.  First Amendment Retaliation Claim

#### a.  Applicable Law

"Prisoners have a constitutional right to petition the government, and it is a violation of

§ 1983 for prison officials to retaliate against prisoners for the exercise of that right." *Bartley v. Collins*, No. 95-CV-10161, 2006 WL 1289256, at *4 (S.D.N.Y. May 10, 2006) (citing *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002)). To state a First Amendment retaliation claim, a plaintiff must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected conduct and the adverse action." *Holland*, 758 F.3d at 225 (citation, alteration, and quotation marks omitted); *see also Washington v. Chaboty*, No. 09-CV-9199, 2015 WL 1439348, at *9 (S.D.N.Y. Mar. 30, 2015) (same). An adverse action is any "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (citation omitted). "[B]ecause virtually any adverse action taken against a prisoner by a prison official — even those otherwise not rising to the level of a constitutional violation — can be characterized as a constitutionally proscribed retaliatory act," the Second Circuit has instructed district courts to "approach prisoner retaliation claims with skepticism and particular care." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (citation and quotation marks omitted); *see also Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("Retaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike." (citation and quotation marks omitted)). "In considering whether a causal connection exists, a court may infer an improper or retaliatory motive in the adverse action from: (1) the temporal proximity of the filing to the grievance and the disciplinary action; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant regarding his motive for disciplining the plaintiff." *Thomas v. DeCastro*, No. 14-CV-6409, 2019 WL 1428365, at *9 (S.D.N.Y. Mar. 29, 2019) (citation and quotation marks omitted).

### b. Application

Correction Officer Defendants note the standard to state a retaliation claim but do not make any argument for dismissal of Plaintiff's retaliation claim, nor do they meaningfully apply the case law to the facts of this case. (CO Defs.' Mem. 31.) Supervisor Defendants argue that Plaintiff alleges no adverse action, as cell searches do not implicate a constitutional right. (Sup. Defs.' Mem. 18–19.)

As an initial matter, there can be no dispute that Plaintiff engaged in protected conduct (1) on October 13, 2017, when he initiated this Action by filing an application for a TRO and preliminary injunction; and (2) on October 31, 2017, when he filed a grievance against Kleingardner. (Am. Compl. ¶¶ 45, 224.) *See Davis v. Collado*, No. 16-CV-7139, 2018 WL 4757966, at *12 (S.D.N.Y. Sept. 30, 2018) ("The filing of lawsuits or prison grievances is a constitutionally protected activity." (collecting cases)).

As to adverse action, Plaintiff alleges that, on October 30, 2017, Kleingardner retaliated against Plaintiff's filing this Action by denying him a grievance form and serving him with a false misbehavior report, after which Plaintiff filed a grievance against him. (Am. Compl. ¶¶ 220–24, 227.) Plaintiff also alleges that, on November 4, 2017, Wilcox retaliated against Plaintiff's filing this Action and "[Wilcox's] being a subject name[d] as a defendant" by denying Plaintiff the ability to prepare for and be heard at a disciplinary hearing. (*Id.* ¶¶ 231–32.) Plaintiff further alleges that, in December 2017, Wilcox, Field, Crawley, Rodriguez, Gorr, and Olsen retaliated against him by holding two disciplinary proceedings outside of Plaintiff's presence that resulted in Plaintiff's being sentenced to 180 and 150 days in punitive segregation. (*Id.* ¶¶ 238–42.) And finally, Plaintiff alleges that, in early January 2018, Gabriel, Lekovic, and

Kleingardner retaliated against him by verbally harassing him, searching his cell, and assaulting him. (*Id.* ¶¶ 338–60, 411.)

The Court agrees with Supervisor Defendants "to the extent that neither the United States Supreme Court nor the Second Circuit has ever held that a cell search can be the basis of a First Amendment retaliation claim." *Davis*, 2018 WL 4757966, at *12 (citations and quotation marks omitted). But Plaintiff alleges conduct separate from the alleged cell search. The Court concludes that this conduct, taken soon after Plaintiff initiated this Action and filed a grievance against Kleingardner, plausibly constitute adverse actions that are causally connected to Plaintiff's protected activities. *See Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (holding that inmate's allegations of a retaliatory assault and issuance of misbehavior report constitute adverse action "that would deter a reasonable inmate from exercising his constitutional rights" (citations omitted)); *see also Abreu v. Lipka*, — F. App'x —, 2019 WL 3540490, at *3 (2d Cir. Aug. 5, 2019) (vacating dismissal of retaliation claim because "a severe beating, false misbehavior reports, or the withholding of medication could constitute sufficiently adverse actions that would deter a prisoner of 'ordinary firmness' from exercising his rights" (citation omitted)). Accordingly, the Court declines to dismiss Plaintiff's retaliation claim.

### 9. Conspiracy Claim

Supervisor and Correction Officer Defendants argue that Plaintiff fails to state a claim of conspiracy because his allegations are conclusory. (Sup. Defs.' Mem. 19; CO Defs.' Mem. 26.) The Court agrees.

To state a claim for a conspiracy under § 1983, Plaintiff must allege facts showing: "(1) an agreement between two or more state actors . . . ; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."

*McGee v. Dunn*, No. 09-CV-6098, 2015 WL 9077386, at *5 (S.D.N.Y. Dec. 16, 2015) (quoting *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999)), *aff'd*, 672 F. App'x 115 (2d Cir. 2017). "A conspiracy claim fails, however, where allegations are conclusory." *Cuellar v. Love*, No. 11-CV-3632, 2014 WL 1486458, at *9 (S.D.N.Y. Apr. 11, 2014); *see also Walker v. Jastremski*, 430 F.3d 560, 564 n.5 (2d Cir. 2005) ("[C]onclusory or general allegations are insufficient to state a claim for conspiracy under § 1983."). Rather, "[a]llegations of a conspiracy . . . must be pleaded with specificity," a "heightened standard." *Scalpi v. Town of E. Fishkill*, No. 14-CV-2126, 2016 WL 858925, at *5 (S.D.N.Y. Feb. 29, 2016); *see also Brewster v. Nassau County*, 349 F. Supp. 2d 540, 547 (E.D.N.Y. 2004) ("Claims alleging conspiracies to violate civil rights are held to a heightened pleading standard." (citation omitted)).

Here, Plaintiff repeatedly makes reference to a conspiracy between various Defendants, (Am. Compl. ¶¶ 65, 94, 159, 190, 201–02, 208, 366, 410–13), as well as between certain Defendants and inmates, (*see id.* ¶ 111), but these conclusory and boilerplate allegations do not plausibly suggest that there existed an agreement to violate Plaintiff's civil rights. *See Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003). A conspiracy claim requires "some factual basis supporting a meeting of the minds." *K.D. ex rel. Duncan v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 208 (S.D.N.Y. 2013) (citation and quotation marks omitted)). Yet, "[c]ritically absent from the [Amended] Complaint are any specific facts identifying 'willful collaboration'" among Defendants "to deny Plaintiff's constitutional rights . . . or [an] 'agreement' between the[m] . . . forming the conspiracy." *Harrison v. New York*, 95 F. Supp. 3d 293, 325 (E.D.N.Y. 2015) (citations omitted). Accordingly, the Court dismisses Plaintiff's conspiracy claim. *See Cox v. City of New Rochelle*, No. 17-CV-8193, 2019 WL 3778735, at *6 (S.D.N.Y. Aug. 12, 2019)

(dismissing conspiracy claim where the plaintiff did not allege specific facts plausibly suggesting an agreement (collecting cases)).

### III.  Conclusion

For the foregoing reasons, Defendants' Motions To Dismiss are granted in part and denied in part.

Plaintiff's request for injunctive relief is dismissed.

Defendants Loughren, Schiff, Ginty, Smith, Chaboty, and Bini are dismissed, as are Plaintiff's claims against all Defendants in their official capacities.

Plaintiff's Fourteenth Amendment medical deliberate indifference claims are dismissed, with the exception of his claim against Nurses Altman, Gandulla, and Moore based on the failure to treat his drug and alcohol withdrawal symptoms, which remains.

Plaintiff's Fourteenth Amendment conditions-of-confinement claims are dismissed, except as to his claim relating to conditions in Sullivan's modular housing, which remains.

Plaintiff's Fourteenth Amendment failure-to-protect claim with respect to the July 2017 inmate altercation is dismissed.  Plaintiff's failure-to-protect claims with respect to the January and February 2017 inmate altercations remain.

Plaintiff's excessive force claims based on the alleged July 2017 pepper spray incident and January 2018 assault remain.

Plaintiff's Fourteenth Amendment due process claims based on his third, fourth, and fifth disciplinary hearings are dismissed, as are his due process claims based on Sullivan's inmate grievance procedure.  Plaintiff's due process claims based on his first, second, sixth, seventh, and eighth disciplinary hearings remain.

Plaintiff's First Amendment access-to-courts claim is dismissed.

Plaintiff's First Amendment retaliation claim remains.

Plaintiff's conspiracy claim is dismissed.

The defendants and claims that are dismissed are dismissed without prejudice. If Plaintiff wishes to file a second amended complaint, Plaintiff must do so within 45 days of the date of this Opinion. Plaintiff should include within that second amended complaint all changes to correct the deficiencies identified in this Opinion that Plaintiff wishes the Court to consider. Plaintiff is advised that the amended complaint will replace, not supplement, the instant Amended Complaint. The second amended complaint must contain *all* of the claims, defendants, factual allegations, and exhibits that Plaintiff wishes the Court to consider. Further, the Court emphasizes that Plaintiff should avoid using legal terms and phrases; rather, Plaintiff should state, in simple terms, what happened, when and where it happened, and who was involved. Plaintiff should also avoid repetition and should seek to organize his second amended complaint in an orderly fashion.

If Plaintiff fails to abide by the 45-day deadline, the claims may be dismissed with prejudice, and the case will proceed on his remaining claims.

The Clerk of Court is respectfully requested to terminate the pending Motions. (Dkt. Nos. 156, 160, 163, 168, 173.)

SO ORDERED.

DATED:    September 26, 2019
          White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE